DUNKIN' DONUTS OF AMERICA, INC., A MASSACHUSETTS CORPORATION LICENSED TO TRANSACT BUSINESS IN NEW JERSEY, AND DUNKIN' DONUTS OF NEW JERSEY, INC., A NEW JERSEY CORPORATION, PLAINTIFFS-APPELLANTS, v. MIDDLETOWN DONUT CORP., A NEW JERSEY CORPORATION, SHAWN DONUT CORP., A NEW JERSEY CORPORATION, AND GERALD SMOTHERGILL, INDIVIDUALLY, DEFENDANTS-RESPONDENTS.

Argued January 8, 1985—Decided July 23, 1985.

*Philip F. Zeidman,* a member of the District of Columbia bar, argued the cause for appellants (*Cossman, Levenstien & Petrics,* attorneys; *Peter J. Cossman,* on the brief).

*Milton D. Liebowitz* argued the cause for respondents (*Liebowitz, Liebowitz & Clark,* attorneys).

*Alan M. Wallack* submitted a brief on behalf of amicus curiae International Franchise Association (*Brener, Wallack & Hill,* attorneys).

The opinion of the Court was delivered by

CLIFFORD, J.

We granted certification, 97 *N.J.* 645 (1984), on the petition of plaintiff-franchisor. Plaintiff obtained relief in the Chancery Division, affirmed by the Appellate Division, based on defendant-franchisee's fraudulent conduct resulting in a breach of the franchise agreements. Despite the fact that the franchisor prevailed below, it claims that the trial court's remedy was inadequate and that the court altered the terms of the franchise contracts, slighted a substantial body of franchise law, and trespassed on the franchisor's valid rights at law. We agree, and therefore modify the judgment below.

## I

Plaintiffs are Dunkin' Donuts of America, Inc. and its wholly-owned subsidiary, Dunkin' Donuts of New Jersey. The former is a national corporation that has franchised hundreds of doughnut shops throughout the country; the latter is a real-estate holding company, used by the parent corporation to hold and to control real estate in New Jersey. This opinion refers to plaintiffs in the singular as Dunkin' Donuts or as franchisor.

Defendant Gerald Smothergill owned all of the stock of defendant corporations, Middletown Donut Corporation and Shawn Donut Corporation. Each corporation had entered into franchise and lease agreements with Dunkin' Donuts, and Smothergill had personally guaranteed these agreements. Defendants are referred to in the singular as Smothergill or as franchisee.

Under the terms of the franchise agreements, Smothergill was licensed to operate two Dunkin' Donuts stores, one in Middletown, and one in West Long Branch. Despite some slight differences between the franchise agreements for the two stores, their basic provisions were the same. Under each franchise agreement, Smothergill was authorized to use the Dunkin' Donuts name and trademarks. He had access to Dunkin' Donuts' baking and marketing methods, and was entitled to the franchisor's technical and management support. Under each franchise agreement, Smothergill was required to keep accurate sales records, to pay a basic franchise fee of 4.9% of gross sales, to pay an advertising fund fee of 2% of gross sales, to meet product quality standards set by Dunkin' Donuts, and to meet the franchisor's service and cleanliness standards.

The lease agreements permitted Smothergill to rent the store premises. Smothergill's right to continue in possession of those premises was expressly conditioned on his remaining as a franchisee in good standing under the related franchise agreements. In August of 1978, Dunkin' Donuts notified Smothergill that his franchise agreements were to be terminated due to

his intentional underreporting of gross sales. The termination notice provided an opportunity for Smothergill to cure his alleged breach by making prompt payment of the amounts claimed to be due. Smothergill made no attempt to cure, taking the position that he was not guilty of underreporting or of any other breach of his franchise obligations.

Having denied any breach, Smothergill refused to abandon his Dunkin' Donuts stores. Thereafter, the franchisor brought suit in the Chancery Division to enforce its claimed right of termination and to collect damages. Smothergill counter-claimed, seeking not only a declaration of his right to continue as a franchisee, but damages as well for unfair treatment by Dunkin' Donuts. The court denied interlocutory relief that would have immediately ousted Smothergill from the stores; hence, Smothergill continued to operate his stores pending the outcome of the trial.

At the conclusion of the trial, the court found as fact that Smothergill had been guilty of substantial, intentional, and long-continued underreporting of gross sales at both of his Dunkin' Donuts stores. The court determined that Smothergill had failed to keep the financial records that were required under the franchise agreements and that the failure to keep records was not the result of carelessness or incompetence. Rather, Smothergill's delinquency in recordkeeping was part of a deliberate effort to underreport sales, which in turn would result in underpayment of franchise fees, underpayment of advertising fund fees, underpayment of rental override charges,[1] and evasion of federal and state taxes. The court determined that during the eighteen-month period immediately preceding the filing of this law suit, Smothergill had intentional-

---

[1] The lease agreement for the West Long Branch store contained a rental override provision, whereby Smothergill was obligated to pay, in addition to the basic monthly rental fee, 7% of the amount by which gross sales exceeded $150,000 per year.

ly underreported sales at the Middletown store by at least $63,000 and at the West Long Branch store by at least $35,000.

In short, the Chancery Division found as fact that Smothergill was "guilty of unconscionable cheating." So affronted by Smothergill's conduct was the court that it ordered that a copy of its letter opinion be forwarded to the Internal Revenue Service. It also retained all exhibits for examination by the IRS. The court concluded that Smothergill's wrongful acts amounted to substantial non-compliance with his franchising responsibilities so that good cause for termination existed. Finally, the court determined that Smothergill was not entitled to any relief on his counterclaim, as Dunkin' Donuts had acted reasonably in deciding to audit Smothergill and had thereafter conducted the audit "with eminent fairness and courtesy."

As remedy for Smothergill's non-compliance with the franchise agreement, the contract provided that the agreement be terminated and that "the rights of the Licensee [franchisee] hereunder shall cease." The trial court indicated that a literal interpretation of this phrase required that Smothergill lose the right to possess the stores, to operate the franchises, and to transfer them for value. The contract additionally provided that the breaching franchisee was obligated to pay as damages all amounts owed to Dunkin' Donuts as a result of the underreported sales, the full costs of investigating such underreporting, and reasonable attorney's fees incurred as a result of the breach.

Despite the foregoing contract provisions, the trial court fashioned its own remedy on the basis of equitable considerations, to replace the "disproportionately harsh" legal remedies set forth in the franchise agreements. Having determined that the combined value of Smothergill's two Dunkin' Donuts locations was at least $250,000, the court believed that bare surrender of the stores by Smothergill in addition to payment of the other specified damages would result in an "inappropriate windfall" for Dunkin' Donuts. Therefore, the trial court's remedy

provided that although Smothergill would lose all rights to occupy and operate the stores, Dunkin' Donuts was to pay him $115,000 upon his surrender of the franchises.

The basis for the $115,000 figure is not entirely clear. Initially the court adverted in its opinion to the fact that $115,000 was the total price paid by Smothergill to purchase the two stores and that the $115,000 payment would permit Smothergill to "salvage his original economic investment in the shops, and he will be left with a decent sum with which to start afresh in a new enterprise which is non-competitive to Dunkin' Donuts." At a later hearing on a motion to reconsider the judgment, however, the court stressed that its opinion was not to be read as support for the right of a terminated franchisee to recoup his original investment.[2] Rather, the court generally explained that the $115,000 payment was part of an equitable remedy "package" that would return to Dunkin' Donuts two franchises worth $250,000, thus netting the franchisor the equivalent of $135,000 in damages due under the terms of the contracts as a result of the breach. See *supra* at 173. However, the court did not support these amounts by reference to any precise figures or calculations rooted in the evidence. The court's remedy package also restrained Smothergill from having an ownership or employment interest in a New Jersey doughnut shop or bakery for a perior of five years, a restriction subsequently imposed on his widow, Smothergill having died.

Both parties sought review in the Appellate Division, Smothergill claiming there was insufficient credible evidence in the record on which to base the findings of fact made below, and Dunkin' Donuts questioning the authority of the trial court to adopt its "equitable" remedy. In an unreported opinion the Appellate Division affirmed the judgment in its entirety.

---

[2]Smothergill's original investment of $115,000 was paid not to Dunkin' Donuts but rather to the predecessor franchisee.

## II

We start with an examination of the remedy actually afforded by the Chancery Division. Although we do not have the benefit of any detailed calculations that led to the trial court's final remedy "package," it is clear that enforcement of Dunkin' Donuts' contractual rights was conditioned on payment to Smothergill of the value of his franchises. A review of the findings of fact made below and the specific terms of the franchise contracts renders that conclusion inescapable.

The court found as fact that the franchises at issue were worth $250,000. At the same time the court recognized that because Smothergill had underreported sales, the express terms of the franchise contracts required him to pay substantial damages to Dunkin' Donuts, representing amounts past due as a result of underreporting sales, costs of investigating the fraud, and costs of litigating the cause of action. The court also recognized that there was good cause to terminate the franchises: the contracts quite simply provided that on breach Smothergill was to be ousted from the stores and lose his right to transfer them for value. Despite those provisions the court, in an effort to avoid what it saw as an "inappropriate windfall," conditioned termination of the franchises on payment by Dunkin' Donuts of $115,000, which represents the full value of the franchises, $250,000, less the substantial damages due to Dunkin' Donuts as a result of the franchisee's breach, $135,000. See *supra* at 174.

In molding its creative remedy the Chancery Division eschewed strict enforcement of the franchise agreements. In effect, it modified the contractual positions of the parties. Although the court offered "equitable considerations" as the basis for its action, we are constrained to conclude that there is no support in equitable principles for the imaginative relief that it fashioned. Moreover, the remedy clearly flies in the face of the common-law rules of franchising, and runs counter to the thrust of modern franchising statutes as well.

## III

An understanding of the errors below is perhaps made easier with an overview of the general body of franchise law. At common law, freedom of contract was the rule applicable to franchise agreements. "Franchise Regulation: Ohio Considers Legislation to Protect the Franchisee," 33 *Ohio St.L.J.* 643, 665 (1972); E. Gellhorn, "Limitations on Contract Termination Rights—Franchise Cancellations," 1967 *Duke L.J.* 465, 468. Thus, a relationship of franchisor to franchisee was no different from that of any other two parties who had contracted and bound themselves to specific responsibilities. Franchise termination clauses tended greatly to favor the interests of franchisors. Franchise agreements of unspecified duration were construed to be terminable at will. D. Chisum, "State Regulation of Franchising: The Washington Experience," 48 *Wash.L. Rev.* 291, 315–16 (1973), and many contracts for set time periods explicitly provided for termination at the will of the franchisor. "Franchise Regulation," *supra,* 33 *Ohio St.L.J.* at 664. Otherwise, the common law respected the franchisor's right to end the franchise relationship on expiration of the franchise agreement or on the occurrence of *any* breach of the provisions of the franchise contract. *See* Chisum, *supra,* 48 *Wash.L.Rev.* at 314–17; "Franchise Regulation," *supra,* 33 *Ohio St.L.J.* at 664; Gellhorn, *supra,* 1967 *Duke L.J.* at 466. The effects of termination were starkly simple—the franchisee would be ousted from the franchise, essentially forfeiting his investment, excepting equipment, supplies, and inventory that had already been purchased. *See* R. Serota, "Constitutional Obstacles to State 'Good Cause' Restrictions on Franchise Terminations," 74 *Colum.L.Rev.* 1487, 1489 n. 13 (1974); Chisum, *supra,* 48 *Wash.L.Rev.* at 315; Gellhorn, *supra,* 1967 *Duke L.J.* at 467 n. 5. The franchisor would then regain full control of the terminated business and would be free to begin a relationship with a new franchisee. No compensation would be paid to the terminated franchisee for the value of his business. *See* Chisum, *supra,* 48 *Wash.L.Rev.* at 315; Gellhorn, *supra,* 1967 *Duke L.J.*

at 467 n. 5; *cf.* Serota, *supra,* 74 *Colum.L.Rev.* at 1493 (franchisor conditioning renewal upon new requirements to be followed by franchisee leaves franchisee "with the Hobson's choice of acquiescence or loss of its investment").

Over time, however, dissatisfaction began to grow with the common-law scheme of termination and nonrenewal. State legislators became increasingly sensitive to the plight of franchisees who had devoted considerable time and money towards building a business only to be terminated at the whim of the franchisor. In response to a perceived disparity in bargaining power, many states passed legislation that afforded to franchisees protection against indiscriminate terminations by prohibiting cancellation or nonrenewal of franchises for other than good cause. *See, e.g., Ark.Stat.Ann.* § 70–810 (1979); *Conn. Gen.Stat.* § 42–133f(a) (Supp.1985); *Del.Code Ann.,* tit. 6, § 2552 (Supp.1984); *Hawaii Rev.Stat.,* § 482E– 6(2)(H)(Supp.1984); *Ill.Rev.Stat.,* ch. 121½, § 704.3 (Supp.1985); *Wash.Rev.Code* § 19.100.180 (1976); *Wis.Stat.Ann.,* § 135.05 (1984).

It is important to emphasize the limited reach of such statutes. These laws are designed to provide relief only to innocent franchisees, those who had complied with the terms of their franchise agreements but nonetheless were victimized by the loss of their franchises. Since Smothergill is not an innocent franchisee, these franchising statutes would leave him remediless, and the policy behind them provides no support for the Chancery Division's imaginative remedy, which results in compensation to a guilty franchisee for the value of his franchise upon termination.

New Jersey does have a statute similarly designed to shield franchisees from arbitrary terminations, the New Jersey Franchise Practices Act (Act), *N.J.S.A.* 56:10–1 to –15; but the express language of the Act discloses immediately that this franchisee does not fall under its protections. *N.J.S.A.* 56:10– 4(2) provides that the Act applies only to those franchises under

which gross sales of products or services between the franchisor and franchisee shall have exceeded $35,000 for the twelve-month period preceding the institution of suit. As it is undisputed that these parties do not meet the $35,000 threshold, the plain language of *N.J.S.A.* 56:10-4(2) dictates that the franchises in issue are not subject to the Act.

■ Nonetheless, to the extent that the Act reflects the prevalent public policy of this state, it applies to all franchises established or maintained in New Jersey. *Shell Oil Co. v. Marinello*, 63 *N.J.* 402, 409 (1973), *cert.* den., 415 *U.S.* 920, 94 *S.Ct.* 1421, 39 *L.Ed.*2d 475 (1974). Given the legislature's findings of longstanding abuses by franchisors in respect of termination, cancellation, and renewal of franchises, legitimate public policy concerns are surely present in this area. We therefore examine the requirements of the Act in the abstract and as applied to this case.

■ The Act provides, in *N.J.S.A.* 56:10-5, that it is a violation to terminate or fail to renew a franchise without good cause, good cause being limited to the failure of a franchisee substantially to comply with the requirements of the franchise agreements. The statute, however, is not designed to protect those franchisees who willfully violate the terms of their franchise agreements. *Amerada Hess Corp. v. Quinn*, 143 *N.J.Super.* 237, 254 (App.Div.1976). Like its sister statutes in other jurisdictions, the New Jersey Franchise Act sensibly authorizes damages only to aggrieved franchisees and does not compensate those franchisees who have lost their franchises as a result of their own neglect or misconduct. The Act allows termination for good cause, and it is undisputed that Smothergill's attempts to defraud Dunkin' Donuts amount to good cause. Accordingly, the statute does not disturb Dunkin' Donuts' common-law right to complete termination.

New Jersey case law does not suggest differently. In *Simmons v. General Motors Corp.*, 180 *N.J.Super.* 522 (App.Div.), certif. den., 88 *N.J.* 498 (1981), a franchisee was found to have

committed a substantial breach of its franchise agreement by failing to give proper notice to the franchisor, General Motors, before selling its franchise. After finally receiving notice of the sale and transfer of the franchise, General Motors investigated the purchaser and justifiably found him unqualified to be an owner and operator of a General Motors dealership. Accordingly, General Motors terminated the franchise.

Although it determined that a breach of the franchise agreement had occurred, the trial court in *Simmons* refused to order immediate termination and instead attempted to "do equity" by granting the unacceptable purchaser a six-month grace period to try and recoup his investment by selling the dealership to a suitable franchisee. The Appellate Division reversed, holding that the franchisee had committed a substantial breach of the franchise agreement and that termination of the franchise was authorized by *N.J.S.A.* 56:10–5 and –6. 180 *N.J.Super.* at 541. Accordingly, the objectionable franchisee had no right to continue operating the franchise or to transfer it for value. Aware of the provision requiring notice to General Motors prior to the transfer of a franchise, he nevertheless chose to take the risk of nonapproval. When he was legitimately found to be an unacceptable franchise owner, he lost all rights to the franchise. Termination was the remedy, and termination was to be imposed without any conditions attached.[3]

The result in *Simmons* is not in conflict with our ruling in *Westfield Centre Serv., Inc. v. Cities Serv. Oil Co.*, 86 *N.J.* 453 (1981), requiring that a nonrenewed franchisee be awarded the actual or reasonable value of his franchise as remedy for nonrenewal. Despite the relief granted in that case, *Westfield* lends no support for the remedy of the Chancery Division here. We ordered such relief in *Westfield* because the franchisor lacked good cause for having failed to renew the franchise as

---

[3]The Appellate Division did stay termination for thirty days but only for the purpose of allowing sufficient time for the franchisee to appeal the decision. We denied certification, 88 *N.J.* 498 (1981).

required by *N.J.S.A.* 56:10–5. Accordingly, the franchisor was in violation of the Act and was liable to the innocent franchisee for the damages sustained thereby, see *N.J.S.A.* 56:10–10, which we determined to be the reasonable value of the nonrenewed business.

Unlike the franchisor in *Westfield*, however, Dunkin' Donuts has not violated any statutory requirements, given the intentional underreporting of sales by Smothergill, which constituted good cause for termination. Because the franchisee's conduct in this case is so dissimilar to *Westfield*'s circumstances, the remedy in *Westfield* of granting the franchisee the reasonable value of the nonrenewed franchise is of no avail to Smothergill.

In fact, if the relief afforded by this Court in *Westfield* has any relevance here, it tends to persuade us that the remedy molded by the Chancery Division was wholly improper. By requiring Dunkin' Donuts to pay compensation to Smothergill for the value of his franchises on their surrender, the Chancery Division has in essence required that Dunkin' Donuts, an innocent franchisor, pay the same "penalty" as was required of *Westfield*'s franchisor, who had violated the New Jersey Franchise Practices Act. Encouraging such a result would offend not only sound policy but common sense as well.

The limited remedies explicitly granted in certain franchising statutes likewise tend to support our conclusion. For example, *Washington Revised Code* § 19.100.180(2)(j) (1978) provides that on termination for good cause, the franchisor must repurchase the franchisee's inventory and supplies at fair market value. However, the statute requires no payment for the value of the franchise. Similar repurchase requirements appear in the franchising statutes of Wisconsin, Michigan, and Mississippi. *See Wis.Stat.* § 135.045 (1984) (remedy available to all terminated franchisees but repurchase requirement applies only to merchandise with a name, trademark, or label that identifies the franchisor); *Mich.Comp.Laws* § 445.1527 (1985) (additionally requires repurchase of equipment, fixtures, and furnishings,

but remedy is available only to nonrenewed franchisees whose term of franchise was less than five years and whose agreement contained covenant not to compete); *Miss. Code Ann.* § 75–77–3 (1979) (remedy available to all terminated franchisees). In Arkansas, only those franchisees terminated without cause must be compensated for supplies, inventory, and equipment, *Ark.Rev.Stat.* § 70–815 (1979), the implication being that those who are terminated for cause get nothing.

Also significant are the statutory provisions that explicitly provide that an innocent franchisee shall be compensated for part or all of the value of his franchise on a franchisor's decision not to renew the franchise. Those provisions are notable in that they require that form of compensation under only very specific circumstances involving injustice to innocent franchisees. *See Hawaii Rev.Stat.* § 482E–6(3) (Supp.1984) (franchisor shall compensate nonrenewed franchisee for loss of goodwill *if* franchise is not renewed for purposes of converting franchise outlet to one owned and operated by franchisor); *Ill.Rev.Stat.*, ch. 121½, § 704.4 (Supp.1985) (nonrenewed franchisee must be compensated for fair market value of franchise *if* agreement contains a covenant not to compete or franchisee was not given six-months notice of nonrenewal); *Wash.Rev. Code* § 19.100.180(i) (1978) (franchisor shall compensate nonrenewed franchisee for value of goodwill *if* franchisee given less than year's notice of nonrenewal and if franchisee is bound by covenant not to compete). The availability of those remedies in only the most narrow circumstances suggests that extension of the same type of relief to a franchisee who has been terminated for cause would be improper.

IV

Finding nothing in the general body of franchise law to indicate that Smothergill should receive value for his franchise as a condition of termination, we next examine whether the Chancery Division can nonetheless require such relief on the

basis of its authority as a court of equity. We have uncovered no equitable maxim or other guiding principle that would support the court's disregard of the terms of the franchise agreements and modifications of the general body of franchise law discussed above. Although the remedy imposed by the court was undoubtedly well-intentioned, naked references to "equitable considerations" are not sufficient support for the type of "creativity" unleashed here. We are not disposed to put all contractual rights at risk in the name of equity.

■■ We focus first on the contention that strict adherence to contractual remedies in the circumstances before us will impose a forfeiture on the franchisee. Although it is true that equity abhors a forfeiture, equity's jurisdiction in relieving against a forfeiture is to be exercised with caution lest it be extended to the point of ignoring legal rights. *See Kama Rippa Music, Inc. v. Schekeryk*, 510 *F.*2d 837, 843–44 (2d Cir.1975); 27 *Am.Jur.*2d, *Equity* § 78 at 601. Thus if parties choose to contract for a forfeiture, a court of equity will not interfere with that contract term in the absence of fraud, accident, surprise, or improper practice. *Osberg Constr. Co. v. City of The Dalles*, 300 *F.Supp.* 442, 447 (D.Ore.1969); *Spangler v. Misner*, 238 *Iowa* 600, 28 *N.W.*2d 5, 9 (1947); *see also Fox v. Haddon Township*, 137 *N.J.Eq.* 394, 398 (Ch. 1945) (court of equity will not interfere with contract that clearly calls for forfeiture unless special equity calling for relief is established); *Abilene Sav. Ass'n v. Westchester Fire Ins. Co.*, 461 *F.*2d 557, 560 (5th Cir.1972) (policy against forfeitures limited and requires some affirmative action by the parties that court can seize on as justification for overriding explicit contractual provisions). Although the Chancery Division did find fraud, to be sure, the fraudulent misconduct was committed by the franchisee, who benefitted from the court's invocation of equity. The only sound conclusion to draw is that equitable relief against forfeitures should *not* be granted to a party whose own knowing fraudulent conduct is itself the cause of the forfeiture. See *Faustin v. Lewis*, 85 *N.J.* 507, 511 (1981),

repeating the equitable principle that a court should not grant relief to one who is a wrongdoer with respect to the subject matter in suit.

■■ In addition, equity will generally conform to established rules and precedents, and will not change or unsettle rights that are created and defined by existing legal principles. S. Symons, 2 J. Pomeroy *Equity Jurisprudence*, § 425 at 188 (5th ed. 1941); 27 *Am.Jur.*2d, *Equity* § 123 at 649 (1966); 30 *C.J.S.*, *Equity* § 103 at 1066 (1965). This is the basis for the equitable maxim "equity follows the law," which instructs that as a rule a court of equity will follow the legislative and common-law regulations of rights, and also obligations of contract. *Natovitz v. Bay Head Realty Co.*, 142 *N.J.Eq.* 456, 463–64 (E. & A.1948).

Specifically, in the area of enforcing contractual rights, the Court of Chancery in *Giberson v. First Nat'l Bank of Spring Lake*, 100 *N.J.Eq.* 502, 507 (Ch. 1927), said:

> Acting on more liberal principles, equity often softens the rigor of the law, and although a party's legal rights are, apparently, clear on the face of a written instrument, that does not preclude a court of equity from *inquiring into the circumstances under which the document was executed or procured* in order to determine whether or not the instrument should be given the effect which at law would necessarily follow from its terms. Such inquiry might indicate a situation which would make it inequitable to enforce legal rights. [Emphasis added.]

■ This passage suggests no more than the settled principle that equity will grant relief in situations involving fraud, accident, mistake, duress, or undue influence, none of which have been established against Dunkin' Donuts. Nor are we confronted with assertions that specific provisions in the franchise contracts should be voided on the basis of unconscionability.

■ Thus, the settled precedent is that in the absence of fraud, accident, or mistake, a court of equity cannot change or abrogate the terms of a contract. *Manufacturers' Fin. Co. v. McKey*, 294 *U.S.* 442, 447, 55 *S.Ct.* 444, 449, 79 *L.Ed.* 982, 986 (1935). Equitable relief cannot be claimed because a contract is

oppressive, improvident, or unprofitable, or because it produces hardship. *Id.; see* 27 *Am.Jur.*2d, *Equity* § 24–25 and 71 and cases cited therein. The foregoing suggests that because the franchise contracts are clear in making the underreporting of sales a material breach of contract, thereby entitling Dunkin' Donuts to terminate the franchise and receive damages due, equity should and must respect these contractual provisions.

We recognize that although ordinarily equity will not divest legal rights, this maxim must yield if "extraordinary circumstances" or "countervailing equities" call for such relief. *Monmouth Lumber Co. v. Indemnity Ins. Co. of America,* 21 *N.J.* 439, 451 (1956); *Camden Trust Co. v. Handle,* 132 *N.J.Eq.* 97, 108 (E. & A.1942). However, we are convinced beyond doubt that no such "extraordinary circumstances" exist in this case to justify the rewriting of basic franchising and contract principles that otherwise apply.

The Chancery Division determined that strict enforcement of the legal remedies in this matter would result in an "inappropriate windfall" for Dunkin' Donuts. We disagree. We read the phrase "inappropriate windfall" as a convenient synonym for the legal concept of "unjust enrichment," a fundamental principle in the area of restitution. Section one of the *Restatement of Restitution* states that "a person who has been unjustly enriched at the expense of another is required to make restitution to the other." But this most basic definition hardly assists those who seek to give the principle a practical application. After all, as noted by Professor Dobbs, it is of little help to find that courts oppose unjust enrichment; it may as well be said that they favor apple pie. D. Dobbs, *Remedies* § 4.1 at 226 (1973). Therefore, in applying the concept of "unjust enrichment" we are mindful of the "moral aura" surrounding the phrase and must take care not to elevate the principle to a higher level than it deserves. *Id.* at 227. "[T]he task is to make the unjust

enrichment principle work with, not instead of, the other policies of the law * * *." *Id.* At the very least, however, comment (c) of the *Restatement* must be emphasized:

> Even where a person has received a benefit from another, he is liable to pay therefor *only if the circumstances of its receipt or retention are such that,* as between the two persons, *it is unjust for him to retain it.* [Emphasis added.]

Here the franchisee deserves to have the full weight of the legal remedies fall upon him. He has been found guilty of unconscionable cheating. Dunkin' Donuts, as franchisor of a sizeable network of New Jersey franchises, has a real and legitimate interest in maintaining the integrity of its system. Other Dunkin' Donuts franchisees also have an interest in promoting honest reporting because a percentage of their reported gross sales are pooled in a common advertising fund that benefits all. To the extent that a franchisee such as Smothergill underreports gross sales, he cheats not only the franchisor but all other franchisees as well.

 Upon signing the franchise agreement, both franchisor and franchisee are aware of the rules of the game. Those rules seem fair. With the advent of the New Jersey Franchise Practices Act, once a franchise relationship begins, all that a franchisee must do is comply substantially with the terms of the agreement, in return for which he receives the benefit of an "infinite" franchise—he cannot be terminated or refused renewal. *N.J.S.A.* 56:10–5. Franchisees, however, should necessarily be aware from the specific terms of their contracts that intentional underreporting of sales will result in termination of the franchises, payment of amounts past due, and reimbursement for costs and fees expended in prosecuting the action. The literal and straightforward application of the legal rules is the risk that a franchisee knowingly assumes when it undertakes to defraud the franchise network. Although it is obvious that on termination for good cause Dunkin' Donuts received something more than it possessed the day

before termination, Dunkin' Donuts received only the benefit of its bargain. It has not been unjustly enriched.

In the absence of fraud, accident, mistake, duress, or undue influence on its part, the franchisor needs the full benefit of its contractual remedies in order to take effective and credible action against franchisees who cheat the system. A franchisee who gets caught with his hand in the proverbial cookie jar, (or doughnut box, as the case may be) must suffer the known consequences. The franchisor needs a more effective deterrent than a system that allows a franchisee to reap his legitimate yearly franchise profits plus all that he can purloin along the way, and then grants him the equivalent of the return of his initial investment when, or if, his thefts are eventually discovered. The contract of the parties provides this more effective deterrent. Enforcing the contract results in no "extraordinary circumstances," *Monmouth Lumber, supra,* 21 *N.J.* at 451, that could justify the intervention of an equity court to remake the bargain that exists between these parties. There are insufficient "countervailing equities," *id.,* to require that the equity court restructure the rights of these parties as they were defined by the existing body of franchise law and the terms of the franchise agreements. Accordingly, we find no basis to support the Chancery Division's creative invocation of its equitable powers.

The judgment of the Appellate Division is modified and the cause remanded to the Chancery Division for entry of judgment there in favor of plaintiff on such terms as will comply with this opinion. The necessity for any further proceedings below is left to the determination of the trial court.

*For modification* —Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and GARIBALDI—5.

*Opposed* —None.