JIFFY LUBE INTERNATIONAL, INC., Plaintiff,

v.

WEISS BROTHERS, INC., Alfred Weiss, Rich Weiss, and John Weiss, Defendants.

Civ. A. No. 93–4217 (JEI).

United States District Court, D. New Jersey.

Oct. 1, 1993.

Reed Smith Shaw & McClay by George E. McDavid, Princeton, NJ, Reed Smith Shaw & McClay by Thomas J. McGarrigle, Philadelphia, PA, for plaintiff.

Brown & Connery by Warren W. Faulk, Steven DeFeo, Westmont, NJ, for defendants.

## MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFF'S APPLICATION FOR TEMPORARY RESTRAINING ORDER OR PRELIMINARY INJUNCTION

IRENAS, District Judge.

Defendants are the owners of a Jiffy Lube rapid lubrication service center operated under the terms of a franchise agreement with the plaintiff. The terms of the agreement require the defendant franchisee to pay a monthly royalty fee to the plaintiff based on a percentage of gross sales.

Defendants intentionally underreported sales figures for several months. When plaintiff discovered the shortage during an audit, it acted to terminate the franchise agreement. On September 28, 1993, plaintiff

filed a complaint and sought a temporary restraining order or, in the alternative, a preliminary injunction, enjoining the defendants from using the plaintiff's trademarks and enforcing the provisions of a covenant not to compete.

Because the relief sought amounted to an economic death penalty for defendants' business, the court deferred action on the application for a TRO and scheduled a preliminary injunction hearing for the following day. Defendants filed a comprehensive answering affidavit, and at the hearing on September 29, 1993, both parties were given an opportunity to present live testimony or offer additional evidence.

On the record presently before the court we find that plaintiff has demonstrated a likelihood of success on the merits and the probability of irreparable harm if a preliminary injunction is not granted.

### Findings of Fact

1. Plaintiff, Jiffy Lube International, Inc. ("Jiffy Lube"), is a corporation organized under the laws of the state of Nevada with its principal place of business in Houston, Texas. Plaintiff's franchisees operate Jiffy Lube Service Centers, which provide rapid lubrication and oil change services throughout the United States and certain foreign countries.

2. To identify service centers which operate within its system, Jiffy Lube has extensively employed and caused to be advertised and publicized throughout the United States its Jiffy Lube marks. Plaintiff is the owner of the marks, has registered the marks with the United States Patent and Trademark Office, and has continually used the marks in connection with the service centers of its system. Although the marks are used as both service marks and trademarks, we shall refer to them in this Order, from time to time, as trademarks.

3. Jiffy Lube franchisees are licensed to use the Jiffy Lube trademarks in connection with their operation of service centers, and are trained to operate these centers using a business plan developed by Jiffy Lube. In exchange, under the terms of their franchise agreements, Jiffy Lube franchisees are required to pay royalties calculated as a percentage of gross sales and to fulfill other obligations to Jiffy Lube. Franchise Agreement at ¶ 4; License Agreement at ¶ 4.

4. Essential to nationwide franchise systems, such as that operated by Jiffy Lube, is the prompt and precise communication of accurate financial information between the franchisor and franchisee.

5. On or about July 30, 1990, defendant Weiss Brothers, Inc. ("Weiss Brothers"), a corporation organized under the laws of the state of New Jersey, became a Jiffy Lube franchisee authorized to operate a Jiffy Lube Service Center at 795 Black Horse Pike, Turnersville, New Jersey (the "Turnersville site").

6. The Turnersville site had previously been operated by a former franchisee, Paul LoPresti, Sr. and Sons, Inc. ("LoPresti"). On July 30, 1990, Weiss Brothers executed an Assignment of License Agreement ("Assignment") by which it agreed to accept the terms and conditions of the License Agreement between LoPresti and Jiffy Lube. Weiss Brothers agreed to pay LoPresti $500,000 for the franchise, of which $350,000 was paid in cash with the balance in a purchase money promissory note. At present the balance due on that note is about $66,000. Affidavit of Alfred Weiss Affidavit ("Weiss Affidavit") at 2, ¶ 4.

7. Weiss Brothers later executed a Franchise Agreement with Jiffy Lube, although the parties dispute the actual date of signing. Defendant Alfred Weiss avers that, though the agreement is dated as of July 30, 1990, it was not signed by Jiffy Lube until August or September of 1992. Weiss Aff. at 2. We find that, irrespective of the date of signing, defendants had knowledge of, and were not surprised by, the contents of the Franchise Agreement, which was attached as Exhibit B to the Assignment signed July 30, 1990. The Assignment provides: "Assignee hereby agrees to execute the replacement Franchise Agreement attached hereto as Exhibit B." Thus, the parties understood, from the outset of their relationship, that the terms of the Franchise Agreement would control that relationship.

8. Paragraph 10 of Addendum B to the License Agreement sets forth the grounds for default and termination. It provides, in pertinent part, that Jiffy Lube would be allowed to terminate the License Agreement without providing an opportunity to cure the default if the "Licensee repeatedly fails to make timely payments of royalties or any monies owing to Jiffy Lube."

9. Paragraph 11 of Addendum B to the License Agreement also deals with the grounds for default and termination. It provides, in pertinent part, that the licensee would be in default if "Licensee knowingly makes any false statements in any reports submitted to Jiffy Lube," and that Jiffy Lube would be entitled to terminate the License Agreement if licensee failed to cure the default within thirty (30) days.

10. Paragraph 21(B) of the Franchise Agreement executed between the parties provides, in pertinent part, that a franchisee would be in default if "Franchisee repeatedly fails to make timely payments of royalties and any monies owing to JIFFY LUBE, any subsidiary of JIFFY LUBE, or a Cooperative," and that Jiffy Lube would be entitled to terminate the Franchise Agreement upon default without giving the franchisee an opportunity to cure.

11. Paragraph 21(B) of the Franchise Agreement also provides that a franchisee would be in default if "Franchisee knowingly makes any false statements in any reports or financial information submitted to JIFFY LUBE," and that Jiffy Lube would be entitled to terminate the Franchise Agreement upon default without giving the franchisee an opportunity to cure.

12. Paragraph 22 of the License Agreement delineates the licensee's "covenants not to compete," which take effect upon the termination of the franchise. These covenants contain geographic and temporal restrictions, whereby the licensee covenants that for a period of three years following the termination of the License Agreement, licensee will not own, operate, or have an interest in a business which is the same or substantially similar to that detailed in the License Agreement, and which is within a ten-mile radius of the location of the business operated under the License Agreement or any other Jiffy Lube Service Center. Defendant Weiss Brothers consented to this provision when it executed the Assignment of License Agreement on July 30, 1990.

13. Paragraph 23 of the Franchise Agreement also contains covenants not to compete, with the very same geographic and temporal restraints. Weiss Brothers consented to this provision when it signed or became aware of the Franchise Agreement on July 30, 1990.

14. On August 6, 1992, Jiffy Lube and Weiss Brothers executed an Amendment to the License Agreement ("Amendment"). Paragraph 17.1 of the Amendment provides:

The undersigned shareholders or partners of Franchisee hereby acknowledge and agree to be bound individually by all covenants not to compete applicable to Franchisee under the terms of the Agreement. . . .

The three Weiss brothers signed the Amendment. Above their signatures is the following provision:

Each undersigned individual represents and warrants to JLI that the undersigned individuals are all of the shareholders or partners of Franchisee as of the date of this Amendment and that the officer who has executed this Amendment on behalf of Franchisee is duly authorized to bind Franchisee to the terms of this Amendment.

15. At the time Weiss Brothers became a franchisee, an ongoing dispute existed between Jiffy Lube and several of its franchises regarding the proper accounting of certain national or "fleet" customers. Rather than pay the individual franchisees, fleet customers were billed directly by Jiffy Lube's corporate headquarters, which later credited franchisees' accounts after deducting royalties and processing costs. Franchisees generally, and Weiss particularly, disputed the method of accounting used by Jiffy Lube in calculating the credits owed franchisees and also disputed the timing of the credits. Weiss argued that by delaying the granting of the credits Jiffy Lube deprived franchises of the opportunity to pay only a 4% "prompt payment" royalty, rather than the usual 5%.

Weiss also argues that it was forced to pay excess interest charges because of the alleged delay in credits. Weiss Aff. at 7–8, 14, 16.

16. A class action lawsuit was instituted by the JLAF, an association of Jiffy Lube franchisees. The lawsuit was settled in mid–1992. It was asserted at oral argument, and not disputed, that the execution of the Amendment was in part a result of the settlement of that suit. Paragraphs 19 and 20 of the Amendment, in fact, provide for mutual releases which were executed and are attached as Exhibit 4 to the Amendment. These releases reference the litigation.

17. Sometime in early 1993 (or late 1992) Jiffy Lube established a centralized point of sale ("POS") computer system (the "J–SMRT") for use by all franchises. As each sale is made, sales information is entered into the computer and transmitted daily from the individual service centers to the corporate headquarters in Houston. Weiss Aff. at 8; Plaintiff's Exhibit P–4; Defendant's Exhibits D–1 to D–3. The implementation of J–SMRT helps both franchisor and franchisee. By providing timely and accurate sales data it allows both parties to have confidence in the financial data on which the calculation of mutual debits and credits depends.

18. Installation of the J–SMRT system at the Weiss Brothers' facility was fraught with difficulties. Apparently, Weiss Brothers maintained its own system, and feared that installation of the J–SMRT would have adverse effects on existing data. Plaintiff's Exhibit P–7. In March of 1993, Weiss Brothers was informed that its intransigence with respect to the computer system was construed as a default under the License and Franchise Agreements, and that it would be given thirty days to cure the default. Plaintiff's Exhibit P–4. Finally, the defendants' site was placed "on-line" and, after initial difficulties with data transmission, the defendants began relaying daily sales information to Houston.

19. Notwithstanding the settlement of the litigation, defendants continued to feel as though Jiffy Lube was incorrectly computing the fleet credits to which Weiss was entitled. In fact, as late as June of 1993, defendants were still inquiring about "confusion" in their royalty accounts. Defendant's Exhibits D–3, D–4. We find that, throughout the length of the franchise, defendants had a dispute with plaintiff regarding the accounting for royalty payments and fleet credits. Weiss Brothers genuinely believed that it was not receiving the credits to which it was entitled and did not fabricate this claim only when caught underreporting sales to Jiffy Lube.

20. On or about March 2, 1993, Weiss Brothers submitted a Monthly Statistical Report to Jiffy Lube which misrepresented that it had achieved $67,833.29 in gross sales for the month of February, when, in fact, gross sales were $75,370.32.

21. On or about April 1, 1993, Weiss Brothers submitted a Monthly Statistical Report to Jiffy Lube showing $73,886.20 in gross sales for the month of March, when gross sales were actually $82,095.77.

22. In August, 1993, defendant Alfred Weiss admitted during an audit at the Turnersville site that Weiss Brothers had knowingly underreported sales for February and March, 1993. In addition, Alfred Weiss admitted that Weiss Brothers had underreported sales from January through December of 1992. Verified Complaint at ¶ 25. In the affidavit submitted in opposition to the application for a preliminary injunction, Alfred Weiss confesses that he "was personally the one responsible for the decision to underreport the sales to Jiffy Lube for the five months in question." Weiss Aff. at 15, ¶ 34.

23. Oral argument solved the minor mystery of how Jiffy Lube was able to determine with pinpoint accuracy the volume of sales concealed by defendant. It was represented by plaintiff's counsel, and not disputed, that defendant installed and entered sales data into computer terminals many months before hooking those terminals to Houston. When the hookup finally occurred, the terminals transmitted not only new data, but also apparently "dumped" its past memory banks over the wires to Houston. The comparison of this new data with the information previously reported by defendant led to the audit and defendant's exposure.

24. Irrespective of the actual motivation for defendants' actions, at no time was any-

one at Jiffy Lube informed that underreporting sales was defendants' way of seeking to offset the amounts allegedly owed by Jiffy Lube.

24. The giving of false information to the plaintiff by the defendants constitutes a failure by the franchisee to substantially comply with the requirements imposed in the License Agreement and Franchise Agreement between Jiffy Lube and Weiss Brothers. While the amount of royalties may not be significant in dollar amount, the integrity of information flowing from franchisor to franchisee goes to the very heart of the relationship.

25. Exercising its option under Paragraph 10 of Addendum B to the License Agreement and Paragraph 21(B) of the Franchise Agreement, on July 28, 1993, Jiffy Lube served Weiss Brothers with a Notice of Termination, effective 12:01 A.M. on September 28, 1993. Jiffy Lube informed the defendants' counsel that its decision to terminate the franchise was based on the defendants' "false statements in reports and financial records submitted to Jiffy Lube." Plaintiff's Exhibit P–6.

26. Despite the Notice of Termination, Weiss Brothers has continued to operate the Turnersville site as a Jiffy Lube Service Center after 12:01 A.M. on September 28, 1993.

**Conclusions of Law**

Rule 65(a) of the Federal Rules of Civil Procedure governs the issuance of preliminary injunctions. When ruling on an application for preliminary injunction, the district court must consider four factors: (1) the likelihood that the applicant will prevail on the merits at the final hearing; (2) the extent to which the applicants are being irreparably harmed by the conduct complained of; (3) the extent to which the defendants will suffer irreparable harm if the preliminary injunction is issued; and (4) the public interest. *S & R Corp. v. Jiffy Lube International, Inc.*, 968 F.2d 371 (3d Cir.1992); *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186 (3d Cir.1990).

*Likelihood of Success on the Merits*

Jiffy Lube alleges in this application that it is being damaged by defendants' unautho-

rized use of its trademarks. The Third Circuit has held that:

> The franchisor has the power to terminate the relationship where the terms of the franchise agreement are violated. Once a franchise is terminated, the franchisor has the right to enjoin unauthorized use of its trademarks under the Lanham Act. Thus, Jiffy Lube will merit preliminary injunctive relief if it can adduce sufficient facts indicating that its termination of [the franchisee's] franchises was proper.

*S & R, supra* at 375.

■ As a federal court sitting in diversity, we apply the substantive law of New Jersey to determine whether Jiffy Lube's termination of the franchise was proper. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *Erie RR Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). When the state's highest court has not addressed the precise issue in question, we must predict how the state's highest court would resolve the issue. *Borman v. Raymark Industries, Inc.*, 960 F.2d 327, 331 (3d Cir.1992). "In a diversity case, however, federal courts may not engage in judicial activism. Federalism concerns require that we permit state courts to decide whether and to what extent they will expand state common law." *City of Philadelphia v. Lead Industries Ass'n*, 994 F.2d 112 (3d Cir.1993).

■ The New Jersey Franchise Practices Act, N.J.S.A. 56:10–1 *et seq.*, expressly applies to the facts of this case: the franchisee maintains a place of business within the state of New Jersey, gross sales for the twelve months that preceded institution of this suit exceeded $35,000, and more than 20% of the franchisee's gross sales were derived from such franchise. N.J.S.A. 56:10–4.

■ Section 10–5 of the New Jersey Franchise Practices Act provides:

> It shall be a violation of this act for a franchisor to terminate, cancel or fail to renew a franchise without good cause. For the purposes of this act, good cause for terminating, cancelling or failing to renew a franchise shall be limited to failure

by the franchisee to substantially comply with those requirements imposed upon him by the franchise.

Defendant Weiss Brothers' failure to comply with Paragraph 10 of Addendum B to the License Agreement and with Paragraph 21(B) of the Franchise Agreement constitute a "failure to substantially comply" with the requirements of the License and Franchise Agreements, and therefore constitute good cause for the Notice of Termination. *See also Dunkin' Donuts of America v. Middletown Donut Corp.,* 100 N.J. 166, 178, 495 A.2d 66 (1985) ("Like its sister statutes in other jurisdictions, the New Jersey Franchise Act sensibly authorizes damages only to aggrieved franchisees and does not compensate those franchisees who have lost their franchises as a result of their own neglect and misconduct."); *Simmons v. General Motors Corp.,* 180 N.J.Super. 522, 435 A.2d 1167 (App.Div.), *cert. denied* 88 N.J. 498, 443 A.2d 712 (1981) (allowing termination of franchise without any condition).

■ Whatever financial disputes existed between the parties, plaintiff was never informed that defendants intended to offset the amounts they believed were owed to them by Jiffy Lube by underpaying royalty fees. Allegations of improper accounting of "fleet credits" by Jiffy Lube, even if proven, would not entitle Weiss Brothers to stop performance (by filing false financial statements and underpaying royalties) and to continue use of the trademarks. *S & R, supra* at 376. The franchisor's right to terminate the franchise agreement exists independently of any claims the franchisee may have against it. *Id.* at 375.

Even conceding that a valid dispute existed between the parties at the time defendant underreported gross sales figures, we simply cannot find that plaintiff's conduct in the dispute rises to the level of "fraud, accident, mistake, duress, or undue influence" that would vitiate its claims of good cause for termination of the franchise. N.J.S.A. 56:10–5; *Dunkin' Donuts, supra,* 100 N.J. at 176, 495 A.2d 66. Indeed, efforts to resolve the confusion over royalty fees were hampered by the defendants' resistance to installation

of the J–SMRT POS computer at the Turnersville site.

■ The accounting for debits and credits between franchisors and franchisees can often be very complex, and the amount of litigation this subject has engendered around the country suggests that these disputes may be the rule rather than the exception. Even taking the Weiss affidavit pretty much at face value, there is nothing to suggest anything in this case but a genuine commercial dispute. Such a dispute might, in some circumstances, justify a franchisee in openly taking a credit or setoff against a debt owed to the franchisor. It under no circumstances justifies furnishing false sales data to the franchisee. *See Bak–A–Lum Corp. v. Alcoa Building Products,* 69 N.J. 123, 351 A.2d 349 (1976) (noting implied covenant of good faith dealing and fair dealing); *Palisades Properties, Inc. v. Brunetti,* 44 N.J. 117, 207 A.2d 522 (1965).

Defendants have hinted at the existence of a sinister, improper motive in plaintiff's vigorous efforts to terminate this franchise, but nothing in the papers really supports this theory. Only time will tell whether further proceedings before the final hearing will add substance to these vague hints.

Section 10–5 of the New Jersey Franchise Practices Act also provides that franchisors must give "written notice setting forth all the reasons for such termination . . . to the franchisee at least 60 days in advance." That requirement was satisfied by the mailing of the Notice of Intent to Terminate to Mr. Alfred J. Weiss on July 28, 1993.

■ That the immediate termination of the Jiffy Lube franchise may work a forfeiture does not alter Jiffy Lube's right to terminate. *See Dunkin' Donuts, supra,* 100 N.J. at 182, 495 A.2d 66:

> Although it is true that equity abhors a forfeiture, equity's jurisdiction in relieving against a forfeiture is to be exercised with caution lest it be extended to the point of ignoring legal rights. Thus, if the parties choose to contract for a forfeiture, a court of equity will not interfere with that contract term in the absence of fraud, accident, surprise, or improper practice. . . .

The only sound conclusion to draw is that equitable relief against forfeitures should *not* be granted to a party whose own knowing fraudulent conduct is itself the cause of the forfeiture.

*Id.* (citations omitted) (emphasis in original). The *Dunkin' Donuts* court found that defendant's underreporting did not give rise to "extraordinary circumstances" that would merit equitable relief: "A franchisee who gets caught with his hand in the proverbial cookie jar, (or doughnut box, as the case may be) must suffer the known consequences." *Id.* at 186, 495 A.2d 66.

We note that in *Dunkin' Donuts* the Supreme Court opinion resulted in defendant losing an initial investment of $250,000. It is not surprising that in both *Dunkin' Donuts* and *S & R* the appellate tribunals reversed trial judges who, quite properly, were disturbed that a franchise termination produced harsh economic penalties for the defendants. With a free hand this court could probably fashion a remedy which would lessen that harm. But in doing so we would be making for the parties a contract that was different from the one to which they agreed and would be ignoring the binding precedent of both the Third Circuit and the New Jersey Supreme Court.

■ Since the franchise was properly terminated under New Jersey law, and since the termination of the franchise rendered defendant's subsequent use of the marks unauthorized under § 32 of the Lanham Act, 15 U.S.C. § 1114, plaintiff has a right to enjoin use of its trademarks if it can demonstrate that defendants' use of Jiffy Lube's valid trademarks is "likely to create confusion concerning the origin of the goods or services." *Opticians Association of America v. Independent Opticians of America,* 920 F.2d 187, 192 (3d Cir.1990); § 43(a) Lanham Act, 15 U.S.C. § 1125.

Courts have found that "there is a great likelihood of confusion when an infringer uses the uses the exact trademark" as the plaintiff. *Opticians, supra,* at 195 (citing *U.S. Jaycees v. Philadelphia Jaycees,* 639 F.2d 134, 142 (3d Cir.1981)). In a factually similar case, where the former franchisee continued to use the trademarks of the franchisor after termination of the franchise, the Third Circuit found that "their concurrent use [of the trademarks] is likely to cause consumer confusion about [franchisee's] affiliation with the franchise." *S & R, supra* at 375. For this reason, the court held that Jiffy Lube had met its burden under §§ 32 and 43(a) of the Lanham Act. *Id.* at 375–76.

Under the New Jersey Franchise Practices Act, the Lanham Act, and applicable case law, plaintiff has adequately demonstrated a likelihood of success on the merits and its entitlement to a preliminary injunction barring defendants from using the Jiffy Lube marks.

Even if the defendants are enjoined from using the plaintiff's marks, Jiffy Lube argues that it would still be harmed by defendant's continued operation of a rapid lubrication service center under a different name. Plaintiff thus seeks a preliminary injunction enforcing the restrictive covenants contained in the License and Franchise Agreements, which prohibit defendants from operating the same or substantially similar business for five years within a ten-mile radius of the Turnersville site or any other Jiffy Lube site.

■ New Jersey cases have considered covenants not to compete executed in connection with an employment contract and those signed incident to the sale of a business. Restrictive covenants ancillary to an employment agreement are enforceable only insofar as they are reasonable under the circumstances. *Solari Industries v. Malady,* 55 N.J. 571, 264 A.2d 53 (1970); *Whitmyer Bros. v. Doyle,* 58 N.J. 25, 274 A.2d 577 (1971). This enforceability is governed by the three-part standard enunciated in *Solari,* 55 N.J. at 53, 264 A.2d 53: (1) it must protect a legitimate interest of the employer; (2) it may impose no undue hardship on the employee; and (3) it must not impair the public interest. Even if the covenant is found to be enforceable, it may be limited in its application concerning its geographical area, period of enforceability, or its scope of activity—the so-called "blue pencil rule." *Solari,* 55 N.J. at 585, 264 A.2d 53; *Coskey's T.V. & Radio Sales v. Foti,* 253 N.J.Super. 626, 634, 602 A.2d 789 (App.Div.1992).

Covenants ancillary to the sale of a business "are accorded far more latitude" in New Jersey. *Coskey's T.V. & Radio Sales, supra,* at 633, 602 A.2d 789. Courts have recognized that participants in the sale and purchase of a business generally have more even bargaining power. In addition, courts have recognized that in addition to the inventory, customer lists, and other physical components of the sale, what is also sold is the good will established by the seller. *See also Central Water Works Supply, Inc. v. Fisher,* 240 Ill.App.3d 952, 181 Ill.Dec. 545, 608 N.E.2d 618 (1993); *Howard Johnson & Co. v. Feinstein,* 241 Ill.App.3d 828, 182 Ill.Dec. 396, 609 N.E.2d 930 (1993). In the sale of a business, the interest to be protected is the value of the good will that is purchased, and courts are therefore more receptive to restrictive covenants that are designed to protect this good will.

However, notwithstanding the deference given to restrictive covenants made in connection with the sale of a business, there is no indication that New Jersey law denies to the court the right to "blue pencil" such a covenant to insure that it is reasonably tailored to meet the *Solari* test of reasonableness. *See Rubel & Jensen Corp. v. Rubel,* 85 N.J.Super. 27, 203 A.2d 625, 629 (App.Div. 1964).

New Jersey courts have not passed on the issue of whether a covenant not to compete in a franchise agreement is more akin to an employment agreement or a sale of business agreement. *See generally* Annotation, *Validity and Construction of Restrictive Covenant Not to Compete Ancillary to Franchise Agreement,* 50 A.L.R.3d 746–754 and Supp. [hereinafter Annotation]. The trial judge in *Dunkin' Donuts* created a remedy package that included enforcement of a covenant not to compete. However, since the Supreme Court focused on other aspects of the "creative remedy" fashioned by the Chancery Court, 100 N.J. at 175, 495 A.2d 66, there was no real discussion of this issue, and the matter was remanded to the trial judge to fashion a remedy in accordance with the Supreme Court opinion. *S & R* is inapposite because it did not deal with the New Jersey Franchise Practices Act.

Although we can find no clear New Jersey precedent, we predict that the New Jersey Supreme Court would rule that covenants not to compete in franchise agreements are closer to agreements ancillary to the sale of a business. The franchisee and franchisor are in a more equitable bargaining situation than the typical employer-employee relationship. More importantly, New Jersey courts have emphasized that the primary characteristic of a franchise is the license given to the franchisee to trade upon and exploit the franchisor's good will. *Liberty Sales Assoc., Inc. v. Dow Corning Corp.,* 816 F.Supp. 1004, 1010 (D.N.J.1993) ("What distinguishes a franchise from an ordinary distributorship is that the goodwill inherent in the name and mark attaches to the entire business of the seller, not just to the goods themselves."); *Neptune T.V. & Appliance Serv., Inc. v. Litton Sys., Inc.,* 190 N.J.Super. 153, 160–61, 462 A.2d 595 (App.Div.1983); *cf. Piercing Pagoda, Inc. v. Hoffner,* 465 Pa. 500, 351 A.2d 207, 211 (1976) (holding that restrictive covenants in franchise agreements are enforceable to protect "the basic product which the franchisor has to sell, namely the franchise itself, . . ."); *see generally* Annotation, *supra* (collecting cases).

One can view a franchise agreement, in part, as a conveyance of the franchisor's good will to the franchisee for the length of the franchise. When the franchise terminates, the good will is, metaphysically, reconveyed to the franchisor. A restrictive covenant, reasonably crafted, is necessary to protect the good will after that reconveyance.

Having ruled that the covenant in question is to be examined under the more liberal standards applicable to the sale of a business, we next examine whether its provisions meet the three-pronged *Solari* test. The "protectible interest" prong is clearly satisfied. Jiffy Lube not only has a valid interest in protecting the good will it has developed over the years by having its franchisees do business at the Turnersville location, but it also has an interest in being able to place a new franchisee at or near the same location where this good will has been created. A reasonably crafted restrictive cove-

nant is a legally acceptable means of protecting these interests.

■ The requirement that there be no undue hardship on the party burdened by the covenant is a bit more troublesome. To prevent the defendants from operating any rapid lubrication service center within ten miles of the Turnersville site or any other Jiffy Lube for three years seems excessive. While it is true that the defendants may be able to expropriate a certain amount of Jiffy Lube's good will if they continued to operate some form of rapid lubrication service center in Turnersville, the same cannot be said if the site were in another part of the state, or another state altogether. Most car owners will stay close to their homes or workplaces when deciding where to service their vehicles. It is unlikely that many customers will travel far to patronize a "Weiss–Lube."

*Solari* and its progeny give the court the ability to "blue pencil" a restrictive covenant to render it reasonable under the circumstances. We find that both the geographic and temporal provisions in the covenant are excessive when measured against Jiffy Lube's protectible interests.

Limiting the enforcement of the covenant to the five-mile radius around the current location in Turnersville preserves the good will accreted at that location. There is simply no rational basis for forbidding the defendants from competing with plaintiff anywhere else in New Jersey or the country in what is essentially a low-technology, routinized business.

Once Jiffy Lube has placed a new franchisee in the Turnersville area, or sufficient time has passed to permit the establishment of a new franchisee, Jiffy Lube's legitimate interest in preventing competition from the Weisses, under their own name or mark, essentially disappears, and the covenant becomes an impermissible restraint of trade. Ten months is more than sufficient time for Jiffy Lube to find and set up another franchisee in the Turnersville area—free from any competition from the defendants.

■ Defendants have argued that the language above the individual signatures of the three Weisses in the Amendment (see ¶ 14 of the Findings of Fact) is not sufficient to contractually bind them to the provisions of ¶ 17.1 of that agreement which provided that they were personally subject to the restrictive covenant. We reject this argument. Not only is the language of ¶ 17.1 clear, but there is also nothing in the legend above the individual signatures which suggests an intent to limit the effect of those signatures.

Weiss Brothers is a small company that is essentially the alter ego of the three Weisses. A restrictive covenant limited to the corporate entity would be essentially meaningless, and we conclude that enforcing the covenant against the individuals protects the legitimate interests of Jiffy Lube discussed above.

*Irreparable Harm to the Plaintiff*

Plaintiff must also demonstrate that the failure to grant a preliminary injunction will result in irreparable injury. In the context of plaintiff's claims for unauthorized use of trademark:

Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill. Lack of control amounts to irreparable injury regardless of allegations that the infringer is putting the mark to better use. Irreparable injury can also be based on the possibility of confusion. Finally, and most importantly for this case, the trademark infringement amounts to irreparable injury as a matter of law.

*S & R, supra* at 378.

■ Irreparable injury to the plaintiffs might also result if the restrictive covenants contained in the License and Franchise Agreements are not enforced. As discussed earlier, the purpose of the restrictive covenant in this setting is to protect the goodwill of the franchisor. Were we not to grant a preliminary injunction, the good will of the franchisor would be harmed by the existence of a competing service center at the very site of the former Jiffy Lube center. Since customers are likely to patronize businesses close to home or work, the operation of a second service center, even without the Jiffy Lube logo, would greatly impair plaintiff's ability to establish another franchise in the area.

Finally, plaintiff may suffer irreparable harm if it is prevented from enforcing the provisions of a Franchise Agreement similar to one signed by all of its franchisees. Defendants have been caught with their hands in the till—indeed, they've admitted to putting their hands there. Were plaintiffs not allowed to terminate an errant franchisee, even (if not especially) one with a proven sales record, other franchisees would get the message that they could defraud with impunity. In a system dependent on accurate communication of information, such a result could be devastating.

*Irreparable Harm to the Defendant*

■ To the extent that the defendants suffer significant, and in a sense irreparable, damage from the granting of the preliminary injunction, this harm is a predictable consequence of their willful breach of contract and their misconduct. As such, it is not the type of harm from which we seek to protect a defendant. While a court fashioning an equitable remedy should not impose hardship on a defendant which exceeds that required to protect a plaintiff's legitimate contractual interests, the often painful harm which follows a defendant who willfully breaches a contractual undertaking is not a basis for denying a plaintiff the relief to which it is legally entitled.

*The Public Interest*

Both the *Solari* test to weigh the reasonableness of a restrictive covenant and the long-established standards for deciding an application for a preliminary injunction require the court to consider the impact of an injunction on the public interest. This interest is little, if at all, implicated in today's proceedings. Depriving people who live or work in the Turnersville area of the opportunity, for a ten month period, to have their cars lubricated by the Weisses seems a minimal intrusion.

To the extent that an injunction bars defendants from using the Jiffy Lube trademarks, the public interest is promoted. As noted in *S & R:*

> In a trademark case, the public interest is "most often a synonym for the right of the public not to be deceived or confused."

*Opticians,* 920 F.2d at 197 (collecting cases). Where the likelihood of confusion arises out of the concurrent use of a trademark, the infringer's use damages the public interest. *See id.* at 197–98. In this respect, harm to the public interest is much like irreparable injury to the trademark owner.

968 F.2d at 379.

In order to allow the defendants an opportunity to shut down their business in an orderly fashion and to appeal this decision to the Third Circuit, the effectiveness of the preliminary injunction will be stayed for a period of fourteen days and will not become effective until 12:01 A.M. on October 15, 1993. Fed.R.Civ.P. 62(a) and (c).

Because of its very serious impact on the defendants, this preliminary injunction shall not become effective until plaintiff posts a bond in the amount of $1,000,000 in accordance with the terms of Fed.R.Civ.P. 65(c). This amount is determined on the basis of the $500,000 paid by the defendants to purchase this franchise and on the basis of the considerable losses which will be incurred by the shutting down of this business. There is simply no doubt on the record before the court that the damages which "may be incurred or suffered by" defendants if they have been "wrongfully enjoined or restrained" may well exceed that amount.

For the reasons set forth above,

IT IS on this *1st* day of October, 1993,

ORDERED THAT:

1. Pending further order of this Court, Defendant Weiss Brothers, Inc., its officers, agents, employees, representatives, and all persons in active concert of participation with it, and defendants Alfred Weiss, Rich Weiss, and John Weiss be RESTRAINED AND ENJOINED from:

a. Operating a Jiffy Lube Service Center at 792 Black Horse Pike, Turnersville, New Jersey, 08012;

b. Operating directly or indirectly any competing rapid lubrication and oil change automotive service center within a five-mile radius of 792 Black Horse Pike, Turnersville, New Jersey,

08012, for ten months from the date this preliminary injunction becomes effective;

c. Using the trademarks, tradenames, service marks, and logos of the Plaintiff;

2. The effectiveness of the preliminary injunction set forth in the first decretal paragraph is STAYED until 12:01 A.M. on October 15th, 1993;

3. The preliminary injunction set forth in the first decretal paragraph shall be not become effective until plaintiff shall have posted a bond, or made a deposit in lieu of surety as permitted by Local Rule 35 A.1, in the amount of $1,000,000, which bond or deposit shall be approved by the Court and otherwise conform to the provisions of Fed. R.Civ.P. 65(c) and Local Rule 35.