NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-4994-18T3

TARTA LUNA PROPERTIES,
LLC, a New Jersey Limited
Liability Company, and
125 ELM STREET, LLC,
a New Jersey Limited
Liability Company,

      Plaintiffs-Respondents/
Cross-Appellants,

v.

HARVEST RESTAURANTS
GROUP LLC, a New Jersey
Limited Liability Company,
CHESTER GRABOWSKI,
and ROBERT J. MOORE,

      Defendants-Appellants/
Cross-Respondents.

_____

> **APPROVED FOR PUBLICATION**
> **January 28, 2021**
> **APPELLATE DIVISION**

Argued November 9, 2020 – Decided  January 28, 2021

Before Judges Currier, Gooden Brown and DeAlmeida.

On appeal from the Superior Court of New Jersey, Chancery Division, Union County, Docket No. C-000101-16.

Joseph P. LaSala argued the cause for appellants/cross-respondents (McElroy, Deutsch,

Mulvaney & Carpenter, LLP, attorneys; Joseph P. LaSala, of counsel and on the briefs; George C. Jones, on the briefs).

Sheppard A. Guryan argued the cause for respondents/cross-appellants (Lasser Hochman, LLC, attorneys; Sheppard A. Guryan and Bruce H. Snyder, of counsel and on the briefs).

The opinion of the court was delivered by

CURRIER, J.A.D.

This litigation arises out of the lease of a building in Westfield in which defendants intended to open a restaurant. The lease agreement contemplated an extensive rebuilding and repair of the premises. During the renovations, plaintiffs raised numerous issues regarding the quality of the construction. They eventually instituted suit seeking the termination of the lease and imposition of a forfeiture as well as an increase in rent. After a bench trial, the Chancery court entered judgment in favor of defendants, finding plaintiffs' claims meritless. However, in determining an award of fees was warranted by principles of equity, the court awarded plaintiffs nearly $1,000,000 in counsel and expert fees.

Defendants appeal from the order granting fees. Plaintiffs appeal from the order denying their request to impose forfeiture and from the calculation of the fee award. Because the fee award was not supported by a contract provision, statutory authority or court rule nor the equities of the

2

circumstances, we conclude the court mistakenly exercised its discretion in its award of fees to plaintiffs – the non-prevailing party.  We affirm the denial of forfeiture.

I.

A.

Plaintiff Tarta Luna is the owner of premises located at 115 Elm Street, Westfield.  Plaintiff 125 Elm is the owner of premises located at 125 Elm Street, which adjoins 115 Elm.  The two premises share a common wall.  The managing partners of the two entities, Norman and Carol Greco respectively, are married to one another.

Defendant Harvest Restaurants Group LLC (Harvest) owns and operates several restaurants.[1]  On October 15, 2013, Harvest entered into an agreement with Tarta Luna to lease the premises at 115 Elm Street for a twenty-year term. Harvest intended to make extensive renovations to the premises, including the reconstruction of the rear annex with a new basement, alteration of the ground floor layout, and the addition of a new second floor with a gable roof for dining space and an outdoor herb garden.

---

[1]  Defendant Chester Grabowski is the managing member of the LLC.  He and defendant Robert J. Moore personally guaranteed Harvest's obligations under the lease agreement.

After executing the lease agreement, Harvest retained the services of a licensed architect and licensed structural engineer to develop the renovation plans. Norman Greco, on behalf of Tarta Luna, authorized Harvest to present the plans to the Westfield Planning Board. The preliminary and final major site plans were approved by the Planning Board in October 2014. Construction began in February 2015.

Grabowski testified that after the Planning Board approved the plans, he met with the Grecos and Moore to discuss Harvest's interest in extending the lease an additional five years. Carol suggested the rent increase as of the twenty-first year should be based on the market value of the premises at that time, accounting for the renovations and increased square footage. Grabowski agreed and asked his attorney to prepare a lease extension reflecting the new terms. Although plaintiffs' attorney forwarded the new document, there was no response from the Grecos and the agreement was never signed. Grabowski stated he wished to extend the lease so Harvest would not lose the building after investing so deeply in the extensive renovations.

Pursuant to the lease agreement, the monthly rent was scheduled to increase every five years. However, Grabowski testified that in the summer of 2015, Norman Greco wanted to immediately increase the monthly rent – from $10,600 to $28,625 – to reflect the increased square footage due to the

4

renovations. When Grabowski refused to agree to the proposed increase, he stated that Norman threatened to "make his life miserable."

In September 2015, Carol Greco raised concerns about the construction of the new second story wall, specifically that it was being bolted to the existing common wall between 115 and 125 Elm Street. She discussed the issue with Grabowski and the Westfield construction official.

In May 2016, Carol retained a local architect – George Sincox. After reviewing the filed permit plans, Sincox sent several emails to the New Jersey Department of Community Affairs (DCA), informing it of his concerns with the construction of the common wall. Sincox advised the DCA that the common wall was not comprised of concrete masonry units as shown on the plans, but the builder was using hollow core terracotta instead, creating a less stable structure. He also queried the fire rating of the common wall and said that defendants were not complying with the applicable building codes. The DCA forwarded the emails to the Town construction official, asking him to address Sincox's concerns with defendants' architect.

Grabowski testified that he informed Harvest's architect, engineer, and attorneys of the Grecos' complaints. He stated that he relied on his "professionals," as well as the Westfield construction official, to perform the renovations in a satisfactory manner.

A-4994-18T3

In June 2016, defendants' architect addressed Sincox's concerns with the construction official. In his letter, the architect stated that prior to demolition the "exact composition of the common wall was not visible . . . hence an assumption was made as to its construction type based on other parts of the building . . . ." The architect further explained:

> This assumption was that the wall has been constructed of concrete masonry units, to be verified in field and that the wall will provide for a three-hour fire resistance. In fact, based on field dimensions and the surveys of the property we had reason to believe that there were two walls adjacent to each other. It was not [until we were] well into the interior demolition when we discovered the wall is in fact a common wall.
>
> During construction I was not notified that field conditions varied from assumed and that this wall was in fact not constructed from concrete masonry units. It was not until recently that it became clear that the wall is made of terracotta blocks.

Defendants' architect then discussed several fire rating manuals and determined that the wall had a three-hour rating as recommended by the National Institute of Building Sciences.

Although the Town construction official initially issued a stop construction order in May 2016 in response to the Grecos' concerns, he rescinded the order shortly thereafter. The June 1, 2016 Notice of Abatement stated "5/31/16 – Upon State inspection, no sign of structural damage to

6

adjoining building. Wall construction is complete in accordance with the approved plans (protection of adjoining building is applicable during construction)." The official added a handwritten note, stating he had advised the DCA that "the party wall in question has already been built. No problem with the wall or the next[-]door property."

Plaintiffs were not satisfied with defendants' response to the issues they had raised with the renovations. Therefore, in addition to Sincox, they retained Anthony J. Pagnotta as an engineering expert, and legal counsel. On June 17, 2016, Pagnotta conducted a structural review of the premises and, among other things, highlighted the issue with the composition of the walls. Plaintiffs' counsel sent a letter to Harvest on June 23 detailing Pagnotta's findings. A similar letter was sent in late July to the Town construction official.

Defendants' engineer responded to counsel's letter in July, advising he would construct a structurally independent load-bearing wall, rather than anchoring to the existing terracotta wall. New construction drawings were submitted. In a certification dated October 25, 2016, the Town construction official stated he "personally inspected the structurally independent bearing wall to confirm that it was constructed in accordance with the drawings." The official concluded that the construction "was performed in accordance with all

7

plans and drawings submitted, conformed with all permits issued, and was in compliance with all applicable Codes."[2]

B.

On August 17, 2016, plaintiffs applied for an order to show cause, supported by their Verified Complaint and certifications from Pagnotta and Sincox. Plaintiffs sought: (1) a preliminary and permanent injunction barring Harvest from continuing renovation activities or opening the premises as a restaurant to the public until all of the issues identified by plaintiffs were fully addressed and resolved; (2) relief for defendants' breach of the lease agreement; and (3) a recalculation of defendants' monthly rent obligation based on the new square footage of the premises.

On August 30, 2016, the Chancery court ordered defendants to respond to the questions raised by plaintiffs' professionals, provide relevant documentation related to the premises, and allow plaintiffs access to the premises. The order also prevented defendants from opening the premises to the public.

---

[2] The Westfield official later indicated, during his February 7, 2017 deposition, that he inspected the structurally independent load-bearing wall during a February 2016 framing inspection, before it was designated as a load-bearing wall.

Defendants subsequently applied to the court for an order permitting them to open the restaurant for business. After hearing argument on the order to show cause and defendants' motion, and relying on the construction official's certifications,[3] the court denied plaintiffs' application and granted defendants permission to open the premises upon the issuance of a Certificate of Occupancy (CO) from the town. On November 11, 2016, Westfield issued the CO and defendants opened the restaurant.

Several days later, plaintiffs challenged the issuance of the CO. The Union County Construction Board of Appeals failed to act within the time limit prescribed by N.J.S.A. 52:27D-127(b), resulting in an automatic denial of plaintiffs' claim.

On December 8, 2016, defendants filed their answer and counterclaims in the Chancery Division action. Defendants alleged, among other things, that plaintiffs' true motivation for initiating proceedings was to "extort additional rent[.]"

Several days later, plaintiffs' counsel served Harvest with a notice of termination that sought to terminate the lease agreement based on Harvest's failure to remedy the violations raised in plaintiffs' June 23, 2016 letter.

---

[3] The official submitted the October 25, 2016 certification referred to above in which he stated that the construction had passed all final inspections and the property was safe for its intended use and occupancy.

Plaintiffs also filed a Complaint in Lieu of Prerogative Writs in the Superior Court, Law Division, Union County, against the Town of Westfield, its building inspector, and Harvest, seeking to rescind and vacate the CO. The action was transferred to the Chancery Division for management with the pending action.[4]

In February 2017, plaintiffs moved to dismiss defendants' counterclaims and for leave to file and serve a supplemental complaint alleging the lease agreement had been terminated and seeking possession, damages, and holdover rent. The court granted plaintiffs' motion, permitting them to file a supplemental complaint and dismissed some of defendants' counterclaims based on the litigation privilege.[5]

## C.

On March 16, 2017, plaintiffs moved for an order requiring the closing of the restaurant or, in the alternative, for an immediate evidentiary hearing. Plaintiffs challenged defendants' compliance with the applicable building codes. Each side presented certifications from their respective experts. After argument, the court denied the motion, finding plaintiffs had not met their

---

[4]  The complaint was dismissed as moot after the Chancery court issued its December 12, 2017 order.

[5]  The remaining counterclaims were dismissed under a May 15, 2017 order.

A-4994-18T3

burden to obtain injunctive relief. The court noted the parties had agreed to the appointment of an independent engineering expert to review the construction work and address the issue of the safety of the structure.

When the parties failed to reach a consensus, the court appointed Glenn Kustera, P.E., to serve as the third-party expert. While Kustera was conducting his investigation, plaintiffs' engineer produced sketches showing the second story wall was anchored to the terracotta wall with a type of screw only meant for use with concrete block. As a result, plaintiffs requested a court order to cease all construction. On August 16, 2017, the court granted plaintiffs' request to open and inspect a portion of the area between the rear wall of the restaurant and the terracotta common wall. The parties and their experts, including Kustera, were permitted to attend the inspection.

On August 22, 2017, Kustera issued his report, addressing whether the structural design of the building complied with the applicable building codes. The expert concluded that "the building addition is not code compliant and has potentially serious structural deficiencies particularly with regard to the lateral stability of the building." He recommended a "comprehensive architectural and structural review" "to determine the extent of the improvements required to attain code compliance."

Two days later, defendants informed plaintiffs and the court that they had asked "two new, independent structural engineering firms to consider the [Kustera] report and provide recommendations." On August 30, defendants told the court that "[i]n light of the [Kustera] report, the goal of all concerned should be the immediate remediation of [the restaurant]. Defendants are dedicated to that result." Thereafter, defendants retained a new structural engineering firm,[6] architects, New Jersey building code specialists, and a fire engineering consultant to design and implement code-compliant plans for the reconstruction of the restaurant.

In late October 2017, the court held a status conference to ascertain the parties' progress. After hearing from counsel and Kustera, the court ordered the parties' experts to meet the following week to discuss a plan for getting the premises code-compliant and scheduled a follow-up conference for November 8, 2017.

During the November 8 conference, the court questioned Kustera whether the restaurant needed to be closed immediately due to safety concerns. Kustera responded that there was "a real safety risk[]" as "[n]obody knows when there's going to be a significant loading event, an earthquake, a high

---

[6] Defendants had to retain a third structural engineer when the second firm advised they did not have enough time to devote to the project.

A-4994-18T3

wind event, act of . . . nature and for that reason, . . . it's not safe."  As a result, the court determined it needed to address plaintiffs' application to close the restaurant for the duration of the remedial reconstruction.

D.

The Chancery court heard testimony over three days in November 2017 from Kustera, as well as experts from both sides.  In a comprehensive December 12, 2017 written opinion, the court noted that all of the experts agreed that the building was not compliant with the applicable building code. The court found that defendants' original structural engineer applied the wrong code when he designed the building and that the "error was compounded when the Township of Westfield's Building inspector also applied the wrong code and granted a [CO] for the building."

The court further found it was necessary to grant a preliminary injunction.  Because the construction proceeded under the wrong building code, the court found there was damage to the joint wall of 115 and 125 Elm Street.  As a result, the court was "convinced there [was] an immediate risk to the general public and the employees of 115 Elm Street."  Therefore, there was irreparable harm if the building was not closed.

The court also weighed the hardship which would be incurred by the parties.  The judge stated that:

> [t]he hardships the defendant will face will be harm to the Harvest Group and [the restaurant's] good name, loss of revenue from being shut down and fifty-five employees being unemployed during the holiday season and into the New Year. Harvest has been on notice of the structural issues at least since [p]laintiffs began the suit on August 17, 2016. A plan to repair the deficiencies has yet to be developed. The hardship that [p]laintiff[s] will face include danger to their building and the danger to the public at large. Public safety is of utmost importance and causes the balance of hardships to weigh in favor of [p]laintiff[s].

Therefore, the court granted plaintiffs' application for a preliminary injunction and enjoined defendants from "engaging in any activities, occupying, operating any business, or opening to the public in any manner any portion of the [p]remises." The order was effective December 15, 2017 and prohibited the restaurant from opening without further order from the court.

In the following weeks, defendants' design professionals met with plaintiffs' professionals to review defendants' plans to bring the premises into code compliance. The plans, which included the installation of steel columns, beams, and supports inside the premises and the construction of a new concrete wall adjacent to the shared wall, were approved by plaintiffs' professionals in early April 2018. The parties also agreed that the remedial construction would be overseen by the Mountainside Construction Department.

On April 13, 2018, defendants submitted the plans to Mountainside officials for review and approval. The plans were approved on April 26 and

Mountainside indicated it was prepared to issue construction permits. Plaintiffs, however, refused to consent to the issuance of the permits because of issues related to handicap access and drainage. Defendants then moved for the court's authorization to begin the construction. The motion was granted on June 11, 2018.

On December 3, 2018, the court permitted the restaurant to reopen upon the completion of all necessary inspections and the issuance of a CO. More than five years had passed since the execution of the lease for the premises. During that time, despite long periods of closure, defendants complied with its obligation to pay rent, real estate taxes, insurance, and other costs associated with the tenancy in addition to spending nearly $3,000,000 in renovation and remedial construction costs.

E.

The court conducted a second bench trial, in August 2018, to resolve plaintiffs' claims of forfeiture of the property, request for increased rent, and for attorneys' fees. On October 12, 2018, the court issued a written opinion and order.

In denying plaintiff's application for forfeiture, the court stated "[t]here [was] no doubt that the addition, as originally constructed, was not in keeping with applicable building codes." However, the court noted that defendants

15

relied upon engineering and architectural professionals for the design and construction of the building as well as the Westfield construction official who issued a CO. The court refused to "find fault with defendant[s] for following their professionals' advice." The judge noted that defendants "were relying on properly credentialed experts[,]" and "had no legal requirement to ignore their experts' advice . . . until . . . the court heard evidence from the various experts, held a hearing, and determined that the building did not comply with code." She found defendants "[could not] be faulted for believing their plans were proper since they had been approved by the Building Inspector."

In denying plaintiffs' claim for forfeiture, the judge reasoned:

> Defendants leased an older building in need of substantial improvements. Defendants invested $2,000,000[7] in improving the building to a point where it is one of, if not the nicest, restaurant in Westfield, NJ. Defendants added a second floor and forty new seats. If [p]laintiffs were to be successful in this request for forfeiture it would greatly and unjustly enrich [Tarta Luna]. [Tarta Luna] has received monthly rent and has not suffered any harm, save attorney fees and expert fees. [Plaintiffs] have received the monthly rent. [They] [are] in the same position [they] would have been if the forfeiture had not occurred. Fed[.] Deposit Ins[.] Corp. v. Rosen[,] 188 N.J. S[uper]. 230 ([App. Div.]1983). The application for forfeiture is denied.

---

[7] An additional $800,000 was spent on repairs but there is no way for the court to ascertain the cost had the building been constructed correctly the first time. (footnote in original).

The court then turned to plaintiffs' request for increased rent. Plaintiffs contended they were entitled to additional rent because of the addition of a second floor, which increased the original square footage figure used to calculate the rent obligation in the lease. The judge rejected plaintiffs' request, noting that the lease did not provide for an increase in rent if the square footage were to be enlarged, and she would not make a better contract for the parties than they had made for themselves. She further reasoned that it was not the intent of the parties to increase the rent, stating plaintiffs' requested increase would "be patently unfair . . . when defendants have expended considerable funds to build the second floor."

Lastly, the court addressed the issue of attorneys' fees. Plaintiffs contended that the court could award fees under several provisions of the lease agreement. The court disagreed, finding there was no contractual basis for the award of fees. The judge stated: "The court cannot find any statute, court rule, or contract provision that supports the granting of legal and expert fees to [plaintiffs]."

However, given her findings that "the renovations, as originally constituted were dangerous to people[,]" "severe damage could have been done to the building[,]" and "[t]o bring this action before the court it was necessary [for plaintiffs] to incur approximately $1,000,000 in attorneys' fees[,]" the

17                                                                      A-4994-18T3

judge concluded that an equitable remedy was warranted. She ordered plaintiffs to submit a certification of services, permitted defendants to respond, and scheduled oral argument.

Plaintiffs submitted certifications from counsel, Pagnotta, Sincox, and Carol Greco. They sought attorneys' fees in the amount of $1,052,341.50, and disbursements and costs, including expert fees, in the amount of $170,968.17, for a total of $1,223,309.67. Defendants, in response, submitted a certification from counsel along with an expert certification from Dennis J. Drasco, Esq. Drasco represented he was a New Jersey attorney who "specializ[ed] in the litigation and trial of complex, commercial, construction . . . cases[.]" He submitted a certification in which he opined as to the reasonableness of the attorneys' fees request based on his review of plaintiffs' certifications and the court's orders.

After oral argument on the fee application, the judge issued an opinion on June 20, 2019, awarding plaintiffs attorneys' fees and costs in the amount of $930,710.33. The judge reasoned that the award of attorneys' fees was "based on equitable principles as a result of this court's determination that the safety of the public had been compromised by the decision to open [the restaurant]." She then clarified that the award was limited in scope and did not include fees for items unrelated to the renovations.

The judge did not consider Drasco's expert certification. Although she recognized him as "a well-qualified professional," the judge disregarded his certification because its content did not concern "a subject beyond the ken of the factfinder[.]"

The judge then turned to a consideration of the reasonableness of the amount of the counsel fee request. She concluded plaintiffs' counsel's hourly rates were reasonable, a concession also made by defendants. The court went through the billing entries carefully, making deductions where she found the time billed was excessive or unnecessary or where there was no explanation of the task.

In further explaining her award and its calculations, the judge described her "feel for the case" she had developed during the proceedings. She stated that defendants were convinced plaintiffs' claims were simply an attempt to extort higher rent and thus did not appropriately weigh their concerns. On the other hand, the judge said plaintiffs were "not any better[,]" as they leased defendants an old building, knowing "extensive renovations" were required and were somewhat obstinate in permitting defendants to perform such work. "Against this background," the judge concluded that,

> [p]laintiffs' litigious approach to the case increased
> attorneys' fees in a manner which is not easily shown
> on the timesheets. From the beginning, [p]laintiffs
> argued everything was a great injustice and danger. A

19

good example of this would be their insistence on drainage studies where the town did not require them and the court ruled were unnecessary.

The court continued,

> Perhaps the best example is the incident with the "hot wall." An employee of [the restaurant] discovered a wall was "hot." The Fire Department was called and all customers were asked to leave the building. The Department of Health and Fire Department allowed the restaurant to reopen shortly thereafter. Despite Harvest taking all the proper steps, [p]laintiffs overreacted by filing an Order to Show Cause. The court has not allowed these fees but cites to the event as an example of the dynamics of the case.
>
> The court certainly does not find [d]efendant[s] blameless. They continued to build without authorization, thus requiring monitoring by the plaintiff. But in balance, the court believes [p]laintiff[s'] actions inflated the legal work required.

Accordingly, the judge reduced the overall award to plaintiffs by five percent. The result was an award to plaintiffs of $930,710.33 in attorneys' and expert fees.

## II.

Defendants appeal from the award of attorneys' fees, calculation of the award, and the exclusion of the Drasco expert certification. In a cross-appeal, plaintiffs contend the trial court erred in denying their claim for forfeiture and in its calculation of the attorneys' fees award.

A Chancery judge has broad discretion "to adapt equitable remedies to the particular circumstances of a given case." Marioni v. Roxy Garments Delivery Co. Inc., 417 N.J. Super. 269, 275 (App. Div. 2010) (citations omitted); see also Salorio v. Glaser, 93 N.J. 447, 469 (1983) (noting equitable remedies "are distinguished by their flexibility, their unlimited variety," and "their adaptability to circumstances"). In reviewing an equitable remedy, we consider three specific components. Marioni, 417 N.J. Super. at 275.

First, the facts the judge adopts in an equity case are entitled to deference "when supported by adequate, substantial[,] and credible evidence." Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484 (1974). Second, in drawing conclusions from those facts, the Chancery judge is required to apply accepted legal and equitable principles; no deference is afforded in this regard. Manalapan Realty, L.P. v. Twp. Comm. of Twp. of Manalapan, 140 N.J. 366, 378 (1995). And third, we will decline to intervene absent an abuse of discretion, or where the judge's conclusions prove inconsistent with her own findings of fact. Marioni, 417 N.J. Super. at 275-76. A court abuses its discretion "when a decision is made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis." Pitney Bowes Bank, Inc. v. ABC Caging Fulfillment,

440 N.J. Super. 378, 382 (App. Div. 2015) (citing Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

## A.

Here, despite concluding that plaintiffs did not prevail on any of their claims, the court awarded them counsel fees and expert expenses. Defendants assert the court abused its discretion because there was no basis in law or equity to support the award.

Generally, we will only disturb an award of attorneys' fees upon a clear abuse of discretion. J.E.V. v. K.V., 426 N.J. Super. 475, 492 (App. Div. 2012). Despite the significant discretion a trial court has in awarding attorneys' fees, "such determinations are not entitled to any special deference if the judge misconceives the applicable law, or misapplies it to the factual complex." Porreca v. City of Millville, 419 N.J. Super. 212, 224 (App. Div. 2011) (citations omitted).

New Jersey is an "American Rule" jurisdiction, reflecting a "strong public policy against shifting counsel fees from one party to another." In re Estate of Stockdale, 196 N.J. 275, 307 (2008). The American Rule prohibits recovery of attorneys' fees "by the prevailing party against the losing party." Ibid. A few exceptions, not applicable here, are authorized under Rule 4:42-9(a).

Our Supreme Court has also recognized several "exceptions to the American Rule that are not otherwise reflected in the text of <u>Rule</u> 4:42-9" and are not allowed pursuant to a statute, court rule, or contract. <u>In re Estate of Vayda</u>, 184 N.J. 115, 120-21 (2005). This category of common law fee-shifting arises out of fiduciary breaches in certain settings, for example the attorney-client relationship or attorneys acting as escrow agents. <u>See</u> <u>In re Estate of Folcher</u>, 224 N.J. 496, 507 (2016).

Here, the Chancery court correctly concluded that no provision in the lease agreement authorized attorneys' fees either expressly or impliedly. The court properly rejected plaintiffs' reliance on four specific paragraphs of the lease for an award. Paragraphs five, six (b), and twenty-two were silent as to attorney's fees and it would be error for the court to construe the provisions any differently than how they were written. <u>See</u> <u>N. Bergen Rex Transp., Inc. v. Trailer Leasing Co., a Div. of Keller Sys. Inc.</u>, 158 N.J. 561, 570 (1999) (noting courts will strictly construe a contract provision in light of the general policy disfavoring the award of attorneys' fees). Paragraph fourteen does permit the recovery of attorneys' fees, but only in the context of indemnification for damages to property or persons caused by defendants or their agents. This clause did not apply under the circumstances present here.

Therefore, there was no statutory or contractual basis for an award of fees. Nor was there a breach of a fiduciary relationship as occurred in Folcher.

Although the Chancery judge also concluded there was no established basis to support a fee award, she nevertheless found that equitable principles demanded the remedy, because "the safety of the public had been compromised by the decision to open [the restaurant]." The general concept of public safety has not previously been recognized as an exception to the policy preventing fee-shifting, and although it might support an award under certain egregious circumstances, those circumstances were not present here.

Plaintiffs contend there is precedent for the court's award under Red Devil Tools v. Tip Top Brush Co., 50 N.J. 563, 575 (1967). We disagree. In Red Devil, the Chancery court found the defendants had wrongfully appropriated the plaintiff's trademark and had infringed upon it, and their appropriation and infringement had been "conscious and deliberate, having been carried out to take advantage of plaintiff's mark and established reputation for the purpose of selling more brushes with greater benefits to defendants than would have been possible without the use of plaintiff's mark." Id. at 566.

The Supreme Court agreed that the plaintiff was entitled to injunctive relief. Id. at 572. In addition, the plaintiff sought an accounting of the

A-4994-18T3

defendants' profits. However, because the plaintiff had not demonstrated damage to its business or goodwill through the sale of the brushes, the Court did not grant the accounting.

The Court stated that the grant of additional relief beyond an injunction was not "automatic for the true judicial goal is a just decree which satisfies 'the equities of the case.'" Id. at 573. Any additional relief was dependent "on the particular circumstances as they appear from the totality of the evidence presented." Ibid. Because the defendants had engaged in "shenanigans," and their conduct was "wrongful," "conscious and deliberate," the Court determined a deterrent was warranted. As a result, the plaintiff was awarded litigation fees, including a reasonable counsel fee. Id. at 575.

In explaining the grant of relief, the Court stated that it protected "the plaintiff for the future[,] [took] care of its actual damage to date, . . . cut into any unjust enrichment of the defendants" and served a deterrent purpose. Ibid. The Court concluded:

> Here the plaintiff's claim was for equitable relief by way of injunction and accounting. Although the trial court granted such relief in full, it appears to us that the equities would be better fulfilled and the administration of justice better served by substituting an award of litigation costs for an ill-suited and more burdensome accounting. This course furnishes a fair measure of compensation in lieu of rather than in addition to the plaintiff's claimed right of recovery on

A-4994-18T3

its substantive cause of action, and, viewed realistically, does not transgress on the safeguards contemplated by the court rules.

[Id. at 576.]

Therefore, the counsel fee award was substituted as a more applicable measure of damages than the accounting originally sought.

We see no similarity between the circumstances in Red Devil and those presented here. Conspicuously lacking in this matter is evidence of any "willful and calculated" misconduct that the Court found existed in Red Devil and warranted the deterrence of a fee award. Id. at 574. To the contrary, the Chancery court here specifically concluded that defendants had not engaged in any intentional misconduct. Instead, they had relied on the advice of their professional architectural and engineering experts as well as the approval and issuance of the requisite permits from the municipality and its construction officials. Defendants had no cause or obligation to ignore their own professionals and municipal officials until an independent expert uncovered deficiencies in the renovation construction.

Defendants agreed to the appointment of an independent expert. Within two days of receipt of the expert's report, defendants informed plaintiffs and the court of its retention of a new structural engineering firm. Defendants also replaced its architectural firm and added additional experts to its team,

26

including firewall and building code specialists. Finally, defendants agreed that a different town should be responsible for overseeing and approving the construction and the issuance of required permits and eventually a CO.

Moreover, defendants here were not unjustly enriched. To the contrary, despite the prolonged closure of the business, defendants complied with their contractual obligations and paid plaintiffs the required rent during the five years of renovations and construction remediation despite only being open for business for one year during that time. Plaintiffs also cannot identify any deterrent value an award of fees might have under these circumstances. Defendants leased the building from plaintiffs with expectations of opening a restaurant. Both parties understood the extensive renovations needed in light of the age of the building. Under the triple net lease, defendants agreed to shoulder all of the expenses even though at the termination of the lease, plaintiffs would remain the owners of the much-improved space.

Moreover, the facts here did not warrant an alternate remedy as the Court found necessary in <u>Red Devil</u>. Plaintiffs were not successful on their primary causes of action for termination of the lease and additional rent. The Chancery court responded to plaintiffs' claims of construction deficiency by closing the restaurant until the construction issues were resolved and the building was compliant with the building codes. In addition, if the building

27

inspector had properly inspected the premises (as he certified was done) defendants would have been put on notice of defects with their renovations and litigation might have been avoided altogether. Finally, as the court noted, plaintiffs have greatly benefitted from the renovations resulting in a much-improved building.

Therefore, for the reasons stated, the Chancery court's award of attorneys' and expert fees was a mistaken exercise of discretion as it departed from well-established precedent and was not founded on any statute, court rule, or contract provision. Nor was the award supported by equitable principles in the absence of any willful misconduct. We reverse the court's order granting counsel and expert fees.

## B.

In its cross-appeal, plaintiffs contend the Chancery court abused its discretion in denying the motion to terminate the lease and to impose a forfeiture on defendants. Plaintiffs rely on Dunkin' Donuts of Am., Inc. v. Middletown Donut Corp., 100 N.J. 166 (1985), and assert they were deprived of a bargained-for remedy under the lease agreement. Because we find the court's decision denying forfeiture was supported by the credible evidence in the record and did not constitute a misapplication of the relevant law, we affirm.

28

As the Supreme Court stated in Dunkin' Donuts, "the settled precedent is that in the absence of fraud, accident, or mistake, a court of equity cannot change or abrogate the terms of a contract." Id. at 183. Moreover, the Court "recognize[d] that although ordinarily equity will not divest legal rights, this maxim must yield if 'extraordinary circumstances' or 'countervailing equities' call for such relief." Id. at 184. (quoting Monmouth Lumber Co. v. Indem. Ins. Co. of Am., 21 N.J. 439, 451 (1956)); see also Mandia v. Applegate, 310 N.J. Super. 435, 449 (App. Div. 1998) (citing 49 Am. Jur. 2d Landlord and Tenant § 339 (1995)) (holding court may deny forfeiture to prevent unduly oppressive result, unconscionable advantage to landlord, or unconscionable disadvantage to tenant).

As the Chancery court concluded, plaintiffs properly served the notice to cure required under paragraph twenty-nine of the lease agreement. And, as described above, defendants' renovations did not comply with the applicable building codes, causing the independent expert Kustera to opine that the premises posed a safety risk. However, the Chancery court also found that defendants could not be faulted for relying on their own professionals, particularly because the municipality, through its construction official, approved defendants' plans and issued the required permits and a CO.

The matter before us is readily distinguishable from <u>Dunkin' Donuts</u>. In that case, the Court imposed a forfeiture and terminated the defendant's lease of two Dunkin' Donuts franchise locations. 100 N.J. at 185-86. The Court noted forfeiture was an extreme remedy but imposed it because there were "insufficient countervailing equities" where the defendant "was guilty of unconscionable cheating[]" in the form of a "substantial, intentional, and long-continued underreporting of gross sales[]" to underpay franchise fees. <u>Id.</u> at 172, 182-86. Here, defendants did not intentionally violate the building codes, but rather relied upon their professionals and approval from the governing authorities.

Moreover, as the Chancery court noted, imposing a forfeiture on defendants would "greatly and unjustly enrich" plaintiffs. Defendants spent nearly $3,000,000 to transform the premises into an upscale attractive restaurant. Defendants paid rent, property taxes and all of the expenses associated with the lease. A termination of the lease following defendants' substantial investment in the premises would result in a windfall for plaintiffs. Therefore, the court did not abuse its discretion in its determination not to impose a forfeiture.

In light of our determination regarding the counsel fee award, we need not address the arguments regarding the award calculation or the admissibility of defendants' expert report.

We reverse the order granting counsel and expert fees. The cross-appeal is affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4994-18T3