**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2720-23

BARBARA J. WALDEN,

      Plaintiff-Appellant,

v.

JOHN WALDEN, TERRY
WALDEN COMPTON, and
PRINCIPAL LIFE INSURANCE
COMPANY,

      Defendants-Respondents.

_____

          Argued September 16, 2025 – Decided October 21, 2025

          Before Judges Rose and Torregrossa-O'Connor.

          On appeal from the Superior Court of New Jersey, Chancery Division, Burlington County, Docket No. C-000114-22.

          Michael Confusione argued the cause for appellant (Hegge & Confusione, LLC, attorneys; Michael Confusione, of counsel and on the briefs).

          Chandra Betner-Gray argued the cause for respondents John Walden and Terry Walden Compton.

PER CURIAM

Plaintiff Barbara J. Walden appeals from the Chancery Division's February 23, 2024 order after trial, rejecting plaintiff's various equitable claims that sought reformation of an annuity contract between her late husband Nathaniel Walden (Nate)[1] and defendant Principal Life Insurance Company (Principal Life) to name her as the annuity's beneficiary. She also appeals from the court's April 19, 2024 order denying reconsideration. Having reviewed the record in light of applicable equitable principles, we affirm.

I.

A. Background

In 2022, after her husband's death, plaintiff filed her complaint specifically requesting the court revise the annuity contract Nate purchased from Principal Life upon his retirement. She alleged Nate's intent in creating the annuity was that they both "receive the [a]nnuity payments during the pendency of their li[ves], or until the [a]nnuity term ended." She claimed the annuity contract mistakenly named John and Terry as beneficiaries and sought revision to name her the sole beneficiary. She further alleged John and Terry initially

_____

[1] To avoid confusion because decedent's siblings, defendants John Walden and Terry Walden Compton share his last name, we use first names. We intend no disrespect in doing so.

agreed to disclaim their interests in plaintiff's favor but later refused.

The complaint raised several equitable theories for relief: reformation (count one); unilateral mistake (count two); mutual mistake (count three); unjust enrichment (count four); equitable estoppel (count five); and lack of consideration (count six). Each claim requested the court "[m]odify[] the language of the [a]nnuity to change the [a]nnuity's beneficiary designation from John . . . and Terry . . . to [plaintiff]."

In their answer, John and Terry maintained they had "no knowledge of the purpose" behind the annuity contract as they were unaware of the contract until receiving notice after Nate's death. They denied making any agreement with plaintiff or having any obligation to sign a disclaimer and indicated they "respect [their] brother['s] . . . wishes" and his "state of mind was clear." They "believe[d] [Nate] wanted to help out his younger brother and sister along with their families" in designating them as beneficiaries. They alleged plaintiff "interrogated" them and "bull[ied]" them to transfer their interest to her, which they refused. Throughout the litigation, Principal Life "took no position regarding who [wa]s to receive the payments from the [a]nnuity."[2]

---

[2] Principal Life's counsel represented at trial the company was a "neutral stakeholder" "only named as a defendant in this case because the annuity at

B.  The Trial

After the close of discovery, the court denied plaintiff's motion for summary judgment and the matter was tried before the same judge on two consecutive days in October 2023.  The following facts were undisputed, and the documents referenced were entered into evidence at trial.

At the time of Nate's passing on May 25, 2022, plaintiff and Nate were married for forty years.  In March 2015, after Nate retired, he purchased with funds from his personal 401(k) a "single premium immediate annuity" from Principal Life for $475,000.  The annuity's "Data Page" reflected a "Start Date" of May 1, 2015, and provided a monthly annuity income payment of $2,307.70 for a twenty-year guaranteed payment period.

The first page of the annuity contract listed Nate as the owner, stating, "This . . . is a . . . contract between You, as Owner, and Us, Principal Life," "based on information You g[a]ve Us and payment of the Single Premium as shown on the Data Page."  The annuity also contained a "death of owner" provision:

---

issue . . . is a Principal Life annuity."  Counsel stated Principal Life took "no position that [it was] entitled to the money," or who should ultimately prevail, but acknowledged it would "continue to maintain the annuity funds until a[ court] order . . . directing . . . how payment should be made."

4

At [y]our death ownership of this contract will pass to the person(s) living on the date of [y]our death in the following order:

1. Surviving Owner, if any
2. Beneficiary(ies)
3. Estate of the last Owner to die

The annuity further provided:

BENEFICIARY

Except as otherwise provided in the death of annuitant section of this contract, the beneficiary(ies) named and recorded at [o]ur office will receive the Remaining Guaranteed Benefit, if any.  You can change the beneficiary designation as provided below.

The annuity contract stated, "The entire contract includes this document, any endorsements, riders, and the Data Page."  The accompanying "Data Page" listed Nate as the "Annuitant" and plaintiff as "Joint Annuitant."

The annuity contract defined relevant terms as follows:

ANNUITANT means the natural person, including the Joint Annuitant, if any, on whose life the amount and duration of the Annuity Income Payment is based.  The Annuitant is named on the Data Page and may not be changed.  The Annuitant may or may not be the Owner. There can be only one Annuitant and only one Joint Annuitant.

. . . .

DESIGNATED PAYEE means the person to receive income payments.

A-2720-23

JOINT ANNUITANT means the natural person named as the Joint Annuitant, if any, on whose life, together with the Annuitant's life, the Annuity Income Payment is based. The Joint Annuitant is named on the Data Page and may not be changed. There can be only one Joint Annuitant.

. . . .

OWNER means the person, including any Joint Owner, who owns an undivided interest in this contract. The Owner may not be changed.

REMAINING GUARANTEED BENEFIT means the benefit, if any, to be paid after the death of the Annuitant(s) as described in the Annuity Income Option on the Date Page.

. . . .

YOU, YOUR means the Owner(s) of this contract.

All other capitalized terms used in this contract but not defined here are found on the Data Page.

The Data Page also contained a section titled "Annuity Income Option,"

which indicated:

JOINT AND REDUCING (FIRST DEATH) SURVIVOR LIFE INCOME WITH GUARANTEED PERIOD: We will pay the Annuity Income Payment, at the Annuity Income Frequency, as long as both Annuitants are alive.

If either Annuitant, but not both, dies before the end of the Guaranteed Period, the Annuity Income Payment only continues until the end of the Guaranteed Period.

6

After the end of the Guaranteed Period, [w]e will begin paying the Survivor Income Payment, at the Annuity Income Frequency. The Survivor Income Payment is the Survivor Income Percentage multiplied by the Annuity Income Payment. The Survivor Income Payment will end with the payment just before the last remaining Annuitant's death.

If both Annuitants die before the end of the Guaranteed Period, [w]e will pay the Remaining Guaranteed Benefit. The Remaining Guaranteed Benefit is the continuation of the Annuity Income Payment, at the Annuity Income Frequency, until the end of the Guaranteed Period.

In the "Beneficiary Supplement," Nate's name was listed as owner and designated John and Terry as primary beneficiaries, with fifty percent of proceeds payable to each on the owner's death. Another document, entitled "Understanding Your Immediate Annuity-Income Annuity," lists "Contract Roles" as follows: (1) "Owner—[i]ndividual or entity that purchases the contract and has ability to make contract changes"; (2) "Annuitant—[t]he contract is based on the life of this individual"; and (3) "Beneficiary—[i]ndividual or entity that receives the claim proceeds in the event of death."

Similarly, a related document, entitled "Investor Profile Questionnaire" labeled Nate as the "contract owner," did not designate a "joint owner" and named John and Terry as "Primary Beneficiar[ies]." The questionnaire reflected the source of funds for the annuity as "[r]ollover distribution from a retirement

7

plan," and the reason for purchasing the annuity as "[p]rovid[ing] current retirement income." Nate's signature appeared at the end as the contract owner, dated March 16, 2015. Fidelity Investments wealth planner and representative Robert W. Lancaster, and principal William Newsome, also signed the contract on that same date.

The annuity payments were thereafter made to Nate exclusively until he died, and plaintiff subsequently notified Principal Life of his death. Principal Life informed plaintiff she was not entitled to benefits, and John and Terry, as the annuity's beneficiaries, would receive monthly payments.

In July 2022, plaintiff's attorney sent correspondence to Principal Life, indicating John and Terry intended to disclaim their interests, and accordingly, requested that any contract payments be put on hold. Principal Life responded by email, explaining:

> The annuitant and joint annuitant are the persons on whose lives the amount and duration of the annuity income payment is based. The annuitant does not have any contractual rights. Therefore, in order for ownership to pass to the joint annuitant, the joint annuitant must be named as the primary beneficiary.
>
> As it seems you are aware, [plaintiff] was neither the joint owner [n]or the designated beneficiary. However, you've indicated that the designated beneficiaries[,] John . . . and Terry . . . would be signing disclaimers. I presume the disclaimers are being signed in order to

8

transfer ownership to [plaintiff]. If that is correct, please know that we will require that a Settlement Agreement and Release be signed by all parties. Please provide the address for John . . . and Terry . . . as that will be part of the agreement. Once I have that information I will prepare the agreement and send it to all parties. Once we receive the signed agreement back from all parties we will then transfer ownership to [plaintiff].

Thereafter, a July 28, 2022 email from Principal Life informed plaintiff that, because "[t]he option elected was Joint and Survivor Life 50% with 20-year period certain[,] [t]he payments will be reduced by 50% to [plaintiff]" to $1,153.85 per month. Principal Life then followed with a second email to plaintiff on that date clarifying "John and Terry[,] as the designated beneficiaries[,] would assume ownership of the contract unless they transfer to [plaintiff] by signing the settlement agreements. As the owners, they would receive [one-half] each of the monthly benefit." Weeks later, plaintiff emailed Principal Life relating that John and Terry "initially expressed an intent to sign a Settlement Agreement and Release, but have since failed to return [her] telephone calls." Plaintiff therefore informed Principal Life that she would "be filing suit . . . in an attempt to resolve the matter."

Plaintiff testified she married Nate in May 1982, and they never had children. Prior to his retirement in 2015, plaintiff and Nate discussed his plans

for their retirement. According to plaintiff, Nate related that he was "going to have payments set up." She acknowledged receiving her own pension and Social Security payments, totaling $6,000 monthly, upon which she and Nate relied. Nate did not have a pension and instead maintained a 401(k) retirement plan account, and he withdrew funds from that account to open the annuity account with Principal Life.

Plaintiff testified she understood the annuity would provide approximately $2,300 in "monthly payment[s] in addition to pension[ and both of their] Social Security payments," which were "put all together to take care of all of [their] bills and mortgage and all of those living expenses." She estimated the retirement income totaled $8,000, and without the monthly annuity payment, she was left with only $1,000 per month after expenses. She indicated that she expected she would personally receive monthly payments from the annuity if Nate predeceased her, and Nate's siblings would receive those payments only after plaintiff and Nate both died, "[b]ecause they were the beneficiaries." Plaintiff confirmed she knew "in real time . . . that Nate was lending John money." She "thought" she always had a good relationship with John and Terry.

Plaintiff recalled receiving a form from Principal Life after Nate's death identifying John and Terry as beneficiaries and requesting their banking

10

information to provide them with annuity payments. She then called John and Terry to "come over" and discuss the implications of their beneficiary designation. Plaintiff described John and Terry as "both very surprised" upon learning of the annuity and claimed both agreed to sign a disclaimer in favor of plaintiff, which they ultimately declined to execute.

Plaintiff testified John followed up after their initial agreement and "came over by himself one time and he said . . . the way this policy is, . . . we're the owners and we could split this 50-50," and "then he said 60-40," but plaintiff declined. She testified John reminded her of the expenses associated with his son with autism to explain his reasons for seeking to retain a portion of the annuity. According to plaintiff, Nate "[i]ntentionally" left John and Terry a separate Fidelity Investments account, from which they jointly received $39,165.60.

She testified "[i]t went without saying" that Nate intended her to continue to receive the annuity payments after his death and she and Nate did not "discuss the beneficiary designations." She explained they "put [their] life's money together, as a married couple, for [forty] years," and she believed Nate "would not give [the] Fidelity Investment, as well as an entire pension to his siblings."

Plaintiff also indicated she "rolled over" into a second annuity approximately $200,000 remaining in Nate's IRA upon his death.

Plaintiff admitted portions of John's and Terry's deposition testimony into evidence. In those portions, John admitted he had no advance knowledge of his beneficiary status, learned of the annuity from plaintiff, and Nate had provided money to John twice while Nate was living when John was "going through a rough patch." He denied offering to split the annuity payments with plaintiff and instead claimed plaintiff "asked [him] what was fair as far as percentages" but "she[ was] not going to be able to show . . . anything written down that [he] signed off on." Terry's deposition testimony similarly reflected she did not know she was named beneficiary or why Nate left her the annuity. Terry indicated she had never asked Nate for money, but Nate had joked about leaving her some "change" when he died.

Plaintiff presented no additional witnesses, and defendants moved for a directed verdict at the close of plaintiff's case. The court denied the motion as to all counts with the exception of the claims of mutual mistake and lack of consideration as they pertained to John and Terry, finding they were not parties to the annuity contract or the creation of it. The court did not dismiss any counts pertaining to Principal Life or the remaining claims involving John and Terry.

12

Robert Lancaster, "vice president at Fidelity Investments," testified on behalf of defendants. Lancaster did not specifically recall selling the annuity to Nate or the nature of any discussions between the two. Referring to the annuity contract, he explained that "[t]he owner is the person who owns the contract," and "usually paid for it," whereas "[t]he payments are based on the lives of the annuitants." He described beneficiaries as "the people who would receive payment if something happen[ed] to the annuitant," and clarified the annuitant is not "automatically a beneficiary." Lancaster indicated he "typically" described this distinction between annuitant and beneficiary to clients, and he "would explain to them that the payments are based on the annuitant. The beneficiaries are the ones who actually . . . come into play, depending on the type of annuity contract, . . . when an annuitant passes away." On cross-examination, he testified that tax consequences would likely result if an IRA owner converted IRA funds into an annuity with a different owner.

Angela Essick, a representative of Principal Life testified regarding the correspondence between plaintiff and Principal Life in July 2022, and Principal Life's correspondence clarifying plaintiff was not the beneficiary of the annuity and confirming plaintiff's representation that John and Terry intended to transfer

13

ownership to her. She explained "[t]he contract owner is the one [who] has the right to the terms of the contract."

In his testimony, John confirmed he and Terry first became aware of the annuity when plaintiff invited them to her apartment. John explained that he spoke with a Principal Life representative, who confirmed the two were beneficiaries, although he had not yet received any payments. John expressed Nate was a lifelong "father figure" to him and "the godfather of his children." He believed his brother intended to name him a beneficiary of the annuity.

C. The Court's Decision

On February 23, 2024, the court issued an order and accompanying comprehensive written decision, denying plaintiff's claims and dismissing with prejudice all remaining counts of her complaint. Preliminarily, the court denied relief under count one pled as "reformation" based on Nate's intent. The court identified reformation as an "equitable remedy" available only upon a showing of "mistake, accident, or fraud," at the time of the contract's formation. The court emphasized reformation cannot be granted merely because enforcement of an otherwise clearly written instrument is "oppressive, improvident, or unprofitable, or because it produces hardship." See Dunkin' Donuts of Am., Inc. v Middletown Donut Corp., 100 N.J. 166, 184 (1985). The court explained,

"reformation is the appropriate relief based on a cause of action such as unilateral mistake or mutual mistake . . . . [it] is not the legal wrong underlying the claims [plaintiff] alleged to have suffered but the remedy."

The trial court next found plaintiff failed to prove by clear and convincing evidence the elements of mutual or unilateral mistake warranting reformation. As to unilateral mistake, the court identified plaintiff's burden to show any alleged mistake resulted from "fraud or other unconscionable conduct of the other party." See Phillips v. Metlife Auto and Home/Metro. Grp. Prop. and Cas. Ins. Co., 378 N.J. Super. 101, 104 (App. Div. 2005). The court reasoned plaintiff neither claimed nor established that John or Terry somehow improperly "induced Nate to purchase the [a]nnuity or to name them as beneficiaries," noting the record confirmed John and Terry "had no knowledge of the [a]nnuity until after Nate's death." Thus, the court found they "did not engage in conduct that would warrant reformation" under a unilateral mistake theory of recovery. Similarly, the court found "[p]laintiff ha[d] not demonstrated, by clear and convincing evidence, fraud or other unconscionable conduct" by Principal Life to warrant reformation for unilateral mistake.

The court cited the annuity's "Death Provision" stating upon the owner's death the beneficiary becomes the owner in the absence of a surviving joint

15

owner. The court assessed the testimony and found plaintiff did not demonstrate that Lancaster, in making the annuity agreement with Nate, "provided false or misleading information to Nate."

In addressing mutual mistake, the court determined plaintiff failed to show any mutual misunderstanding of an essential fact at the time the annuity was executed. Specifically, the court examined the testimony and the relevant documents and concluded plaintiff did not prove that Nate did not intend to name his siblings as the beneficiaries or "misunderstood the monthly payments would stop after his death and pass to John and Terry." The court found it "clear based on [plaintiff's] testimony that [she] and Nate had a loving relationship spanning over four decades." Although the court interpreted plaintiff's use of the phrase "[i]t goes without saying" to describe her understanding of her husband's intent, "reflect[ing] a silent mode of communication between two people who have been together for many years," the court also considered the "documentary or testimonial evidence to glean what Nate intended at the time the [a]nnuity was purchased."

The court explained it "c[ould] not excuse Nate's lack of diligence to ensure" plaintiff would receive the annuity payments after his death and decided it "must hold each party to their contractual obligations." Although believing

16

"[plaintiff] to be a highly credible witness" who testified as to her own understanding of Nate's intent, the court found she did not demonstrate by clear and convincing evidence that Nate intended something other than to name his siblings as beneficiaries or why Nate would not have taken care to list plaintiff as joint owner or correct that error when given the opportunity. Citing <u>Crescent Ring Co. v. Travelers' Indem. Co.</u>, 102 N.J.L. 85 (E. & A. 1926), the court explained, "absent clear and convincing evidence of fraud or wrongful acts on the part of Principal Life, the court must hold each party to their contractual obligations," denying the request to reform based on mutual mistake.

Regarding unjust enrichment, the court found no quasi-contract with John and Terry. It added that "[e]ven if the court was to infer Nate had an implied contract with John and Terry, there was no testimony that either defendant induced or persuaded Nate to name them as beneficiar[ies] to the [a]nnuity." It found "[n]either John nor Terry had an expectation to receive monies from Nate [n]or acted in a manner which would make the receipt of such a benefit inequitable."

The court similarly determined plaintiff failed to establish John and Terry were equitably estopped from receiving the annuity funds as she "failed to demonstrate Nate acted or changed the designations under the [a]nnuity to Nate's

17

detriment based on John or Terry's conduct," especially in light of John and Terry's lack of knowledge of the annuity until after Nate's death. The court emphasized plaintiff contended John and Terry changed their position regarding disclaiming their interest only "after learning they were the designated beneficiaries under the [a]nnuity." Thus, the court concluded, even accepting plaintiff's testimony that John and Terry agreed to but later declined to disclaim their interests, those actions were "immaterial to the actions Nate took when purchasing the [a]nnuity."

D. Motion for Reconsideration

On April 19, 2024, the trial court issued an order and accompanying written decision, denying plaintiff's motion for reconsideration.[3] The court recounted the parties' arguments, summarizing plaintiff's claim the court failed to properly consider Lancaster's testimony. In doing so, the court noted plaintiff contended Lancaster's testimony "demonstrated he misunderstood the process as to who receives the [a]nnuity benefits upon Nate's death and . . . failed to properly explain the process to Nate when the beneficiary designations were

---

[3] In the order, the court noted it "reviewed the filings and heard . . . oral arguments." Because plaintiff did not provide the transcript of the reconsideration motion, we cite the court's decision defining the parties' positions.

selected."

The court found "Lancaster's testimony, that the amount given to a beneficiary is dependent upon the life of an annuitant, [wa]s not a misunderstanding but characterize[d] the terms as set forth under the [a]nnuity." The court found "Lancaster did not say the beneficiaries' right of ownership of the [a]nnuity [wa]s based on the death of the annuitant. Rather, Lancaster testified the beneficiaries' payment amounts [were] based upon when an annuitant passes away," in accordance with the "Annuity Income Option" on the Data Page. The court also noted plaintiff failed to question Lancaster regarding any potential misunderstanding. Accordingly, the court found "[p]laintiff ha[d] failed to demonstrate that the court's decision was based on an incorrect or irrational basis or that it did not consider the significance of competent or probative evidence."

## II.

Plaintiff appeals, raising several arguments. Initially, plaintiff contends, for the first time on appeal, that the contract was ambiguous, and the court "committed reversible error" by failing to first construe the contract's language for its intended meaning. She contends, had the court conducted the proper analysis, it would have found as "a reasonable interpretation" that plaintiff was

actually a joint owner of the annuity. She contends "[i]t [wa]s reasonable to conclude" she also [was] an '[o]wner' of the annuity contract because she too 'own[ed] an individual interest in'" the contract. She newly contends the $475,000 Nate withdrew from his 401(k) to purchase the annuity "emanated from earnings" obtained during Nate's and plaintiff's marriage, rendering her the joint owner under principles of family law governing marital assets, specifically in an "ownership by the entirety."[4] Alternatively, plaintiff asserts the court erred in failing to recognize another reasonable interpretation of the contract that would recognize her as a "designated payee" by virtue of her designation as joint annuitant.

Plaintiff alternatively asserts, as she contended below, "[e]ven if [she] has no legal right to receive the benefits of the annuity contract, the . . . court erred by failing to apply an equitable remedy to afford her relief." She argues the court erred in denying her claim of unjust enrichment, again asserting the funds used to purchase the annuity were marital property and not intended for John and Terry who will receive an unjust windfall to her detriment. She also contends the court erred in failing to "sensibly apply the doctrine of unilateral

---

[4] Although not pled or argued to the trial court, plaintiff argues the annuity contract violated N.J.A.C. 11:4-40.3 which prohibits annuity "provisions which are unjust, unfair, inequitable, misleading or contrary to law."

mistake" to correct the contract to reflect Nate's intent.  She further argues, even assuming plaintiff did not establish unilateral mistake or unjust enrichment, the court improperly failed to use its inherent power to fashion another equitable remedy.

III.

This court engages in a limited review of a trial court's decision after a bench trial.  See Llewelyn v. Shewchuk, 440 N.J. Super. 207, 213 (App. Div. 2015).  Indeed, we will "not disturb the factual findings and legal conclusions of the trial judge unless . . . convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]"  Seidman v. Clifton Sav, Bank, S.L.A., 205 N.J. 150, 169 (2011) (alteration in original) (quoting In re Tr. Created by Agreement Dated Dec. 20, 1961, ex rel. Johnson, 194 N.J. 276, 284 (2008)).  Deference is accorded "because an appellate court's review of the cold record is no substitute for the trial court's opportunity to hear and see the witnesses who testified on the stand."  Balducci v. Cige, 240 N.J. 574, 595 (2020).  When "the trial court's decision constitutes a legal determination, [appellate courts] review it de novo."  D'Agostino v. Maldonado, 216 N.J. 168, 182 (2013).  The interpretation of contract language is also "generally subject to de novo review."

21

Balducci, 240 N.J. at 594.

Before turning to plaintiff's equitable claims for reformation, we first address plaintiff's belated claims asserting the trial court erred by failing to: (1) initially address whether the contract was plain and unambiguous, (2) determine the language was ambiguous, and (3) construe its meaning in light of Nate's alleged intent and interpret the contract as naming plaintiff a joint owner or designated payee. We generally "decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available unless the questions raised on appeal concern jurisdiction or matters of great public interest." Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) (internal quotation marks omitted); see also Zaman v. Felton, 219 N.J. 199, 226-27 (2014). Here, not only are these claims freshly debuted on appeal, but they were not explored or contested at trial and are antithetical to plaintiff's pleadings which presumed facially unambiguous contract provisions.

Plaintiff pled and conceded—from complaint through trial—the contract named Nate as sole owner and John and Terry as beneficiaries. The complaint's singular prayer for relief requested the court equitably reform the contract's terms as written to substitute plaintiff as the sole beneficiary. She never requested the trial court interpret the contract as already designating her joint

owner or payee. She never pled or raised an ownership claim to the annuity as marital property. Nonetheless, she now argues we must reverse the trial court for failing to provide relief she never requested on legal grounds she never raised. Accordingly, we decline to consider these arguments that wholly revise her claims to advance a diametrically different factual construct and alternative legal theory on appeal.[5]

We next address plaintiff's renewed arguments contending the court erroneously denied her equitable claims.[6] Equitable principles allow for reformation of an unambiguous contract. Dunkin' Donuts, 100 N.J. at 183-84. "[A]lthough a party's legal rights are, apparently, clear on the face of a written instrument, that does not preclude a court of equity from inquiring into the circumstances under which the document was executed or procured in order to determine whether or not the instrument should be given the effect which at law would necessarily follow from its terms." Id. at 183.

---

[5] It merits noting that in connection with the equitable claims, the court analyzed the contract terms as reflecting Nate was the owner, John and Terry were the beneficiaries, and plaintiff was not named joint owner or designated beneficiary.

[6] In her brief, plaintiff argues only that the court erred in failing to find unjust enrichment and unilateral mistake, failing to raise specific legal arguments as to the remaining equitable claims thereby waiving them. Because she also makes a sweeping claim that the court should have used its inherent powers in equity to provide a remedy, we will address the remaining claims.

However, reformation is an "extraordinary remedy," <u>Martinez v. John Hancock Mutual Life Insurance Co.</u>, 145 N.J. Super. 301, 312 (App. Div. 1976), justified only when there has been "mutual mistake or unilateral mistake by one party and fraud or unconscionable conduct by the other," <u>St. Pius X House of Retreats, Salvatorian Fathers v. Diocese of Camden</u>, 88 N.J. 571, 577 (1982). The party seeking reformation is required to present "'clear and convincing proof' that the contract in its reformed, and not original, form is the one that the contracting parties understood and meant it to be." <u>Cent. State Bank v. Hudik-Ross Co., Inc.</u>, 164 N.J. Super. 317, 323 (App. Div. 1978) (quoting <u>Brodzinsky v. Pulek</u>, 75 N.J. Super. 40, 48 (App. Div. 1962)). "Clear and convincing evidence is evidence that produces 'a firm belief or conviction' in the truth of the alleged facts. . . . More descriptively, 'it is evidence so clear, direct, weighty in terms of quality, and convincing as to cause [one] to come to a clear conviction of the truth of the precise facts in issue.'" <u>In re Accutane Litigation</u>, 235 N.J. 229, 276 (2018) (alteration in original) (internal citation omitted).

First, we have reviewed the trial court's thorough decision and discern no abuse of discretion in its denying plaintiff's claims of unilateral and mutual mistake. "The doctrine of mutual mistake applies when a 'mistake was mutual in that both parties were laboring under the same misapprehension as to [a]

24

particular, essential fact.'" Bonnco Petrol, Inc. v. Epstein, 115 N.J. 599, 608 (1989) (alteration in original) (emphasis omitted) (quoting Beachcomber Coins, Inc. v. Boskett, 166 N.J. Super. 442, 446 (App. Div. 1979)). Unilateral mistake, on the other hand, contemplates a situation in which the "mistake on the part of one party is accompanied by fraud or other unconscionable conduct of the other party." Phillips, 378 N.J. Super. at 104. Unconscionable conduct "implies [a] lack of 'good faith, honesty in fact[,] and observance of fair dealing.'" Cox v. Sears Roebuck & Co., 138 N.J. 2, 18 (1994) (quoting Kugler v. Romain, 58 N.J. 522, 544 (1971)).

Because the court found Terry and John were not parties to the contract and were not involved with its formation, it concluded they did not induce Nate or act in bad faith to bring about their beneficiary designation. The undisputed facts in the record amply supported the court's decision that John and Terry had no advance knowledge of the annuity. Accordingly, we discern no basis to disturb the court's finding that plaintiff failed to establish unilateral or mutual mistake based on conduct involving the individual defendants.

Likewise, we conclude the court reasonably determined Principal Life did not act unconscionably or in bad faith in securing the contract with Nate, and plaintiff did not prove Nate and Principal Life suffered from a mutual

25

misunderstanding of the terms of the annuity contract. The court reviewed Lancaster's testimony and found plaintiff did not show Lancaster misled Nate in some way regarding the significance of naming plaintiff as joint annuitant and John and Terry as beneficiaries, should Nate as sole owner predecease plaintiff. Importantly, the court evaluated the testimony and evidence and found plaintiff had not established by clear and convincing evidence Nate's intent diverged from the annuity's terms despite plaintiff's testifying to her own tacit understanding of the annuity's purpose. We are satisfied the court's determination was rooted in the record and applicable law.

We further conclude the court did not erroneously deny relief sought under plaintiff's unjust enrichment theory. Unjust enrichment "is not an independent theory of liability, but is the basis for a claim of quasi-contractual liability." Goldsmith v. Camden Cnty. Surrogate's Off., 408 N.J. Super. 376, 382 (App. Div. 2009) (quoting Nat'l Amusements, Inc. v. N.J. Tpk. Auth., 261 N.J. Super. 468, 478 (Law. Div. 1992)). Such relief "rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." Goldsmith, 408 N.J. Super. at 382 (quoting Assoc. Com. Corp. v. Wallia, 211 N.J. Super. 231, 243 (App. Div. 1986)). The court correctly found no implied contract between either Nate or plaintiff and John and Terry

and properly determined plaintiff had not established Nate's intent was other than to provide a benefit to his siblings. Thus, the court did not misuse its discretion in denying relief based on unjust enrichment.

Similarly, we discern no error in the court's finding no basis for plaintiff's claim of equitable estoppel, as the record amply supported the court's finding plaintiff failed to show defendant "engaged in conduct, either intentionally or under circumstances that induced reliance." Hirsch v. Amper Fin. Servs., LLC, 215 N.J. 174, 189 (2013). Likewise, the court correctly determined plaintiff's claim that John and Terry could not benefit from the annuity because they failed to provide consideration could not be sustained as the two were never parties to the agreement.

Plaintiff presents no specific arguments challenging the court's denying her reconsideration motion. We nonetheless note we perceive no error in the trial court's finding insufficient grounds to revisit its determination.

To the extent not addressed, plaintiff's remaining contentions lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Hanley

Clerk of the Appellate Division

A-2720-23